# WHITE v. BARBER.

## SAME v. SAME.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Argued November 17, 1887. — Decided December 5, 1887.

A *bona fide* contract for the actual sale of grain, deliverable within a specified future month, the only option in which is an option in the seller to deliver it at any time within such month, is not a gambling contract, within the meaning of § 130 of chapter 38 of the Revised Statutes of Illinois. (Hurd's ed. of 1883, p. 394; do. of 1885, p. 405.)

W. claimed to recover from B., by a suit in equity, money which he had put into the hands of B., as a broker, to be used by him in transactions which W. alleged were wagering contracts, because they were sales of wheat in regard to which both W. and B. did not intend there should be any delivery of the wheat: *Held*, that what W. did in connection with the transactions was inconsistent with such claim; that B. had no such understanding; that the sales of wheat were lawful; and that W. was not entitled to recover the money which B. had paid out.

B. having paid out the money in settlement of the sales according to the rules of the board of trade of Chicago, was not a " winner " of the money from W., within the meaning of § 132 of chapter 38 of the Revised Statutes of Illinois. (Hurd's ed. of 1883, p. 394; do. of 1885, p. 405.)

Moreover, as W. set up as the ground of recovery that the transactions were gambling transactions, as between him and B., he could not recover back the money.

THE case, as stated by the court, was as follows:

The first one of these cases is an action at law brought on the 10th of May, 1883, by James B. White against George M. Barber, in the Superior Court of Cook County, Illinois. The declaration demanded the sum of $15,000, and declared on the common counts. The defendant pleaded *non assumpsit*. In June, 1883, the cause was removed by the defendant into the Circuit Court of the United States for the Northern District of Illinois. At the trial, in February, 1884, there was a verdict for the defendant, followed by a judgment for him, to review which the plaintiff has brought a writ of error.

There was a bill of exceptions, the whole of which is in substance as follows:

The plaintiff introduced the following evidence. James B. White, the plaintiff, "testified, that now, and during the time in question, he resided at Fort Wayne, Indiana, engaged in the business of dealing in general merchandise; that, in 1879 and prior thereto, one A. S. Maltman, of Chicago, acted as his agent in purchasing and forwarding merchandise of various kinds; that, about September, 1879, desiring to do some trading on the board of trade, Chicago, I asked Maltman to recommend some good responsible broker on the board of trade, through whom I could do business; that Maltman recommended the defendant, who then, and during the time in question, was a broker residing in Chicago and doing business on the board of trade; that thereupon I commenced trading on the board, sending my orders at first to Maltman, who communicated them to the defendant; that, about December, 1879, I came to Chicago, made the acquaintance of defendant, and thereafter did business directly with him; that I continued to do business with defendant during the years 1879, 1880, 1881, and 1882, buying and selling on the board, through the defendant, as broker, corn, wheat, oats, pork, and other commodities, and that, about April 19th, 1882, I had a settlement with defendant, in which all previous dealings were adjusted; that up to this time the transactions which I had made through defendant on the board amounted to $105,000, in 1879; $1,718,000, in 1880; $640,000, in 1881, and $672,000, in 1882; that, in November or December, 1879, and at other times prior to the settlement in April, 1882, I had conversations with the defendant in which I told defendant that I was a merchant in Fort Wayne, and did not want it known that I was engaged in speculating on the board of trade in Chicago, as it might affect my credit, and that the account could be kept in the name of A. S. Maltman; that I considered it a hazardous business, but was willing to gamble provided I could have a fair show; that I wanted my deals placed with responsible parties, so that I could get my money when I made it; that I didn't want any of the property, but meant

simply to do a gambling business; that defendant told me (plaintiff) that he knew what I wanted; that Maltman had explained my situation and business; that he would deal only with responsible parties, and the deals should be settled so as to get the profits or losses; that defendant told me (plaintiff) that not one bushel in a million that was bought and sold on the board was legitimate business; that a few of the large houses did some legitimate business, but most of it was simply trading in differences; that he (defendant) did nothing but business of the latter kind; that he dealt mostly for himself; that he did a good deal of 'scalping,' deals made and closed the same day, on the turn of the market; that he did not let his deals run over night; that, up to April, 1882, I (plaintiff) never delivered or received any of the property so sold or bought, nor was anything ever said by defendant to me about receiving or delivering the property or making arrangements to do so; that, from time to time, defendant rendered statements to me (plaintiff) showing the deals made, the price per bushel, or, in case of pork, the price per 100 lbs., at which the commodity was bought and sold, the difference in dollars and cents, the commissions charged, and the total debit or credit passed to my account; that all the deals made were in form contracts for future delivery, in which the seller had the option of delivering at any time during some future month; that, up to April, 1882, all trades made by defendant for me (plaintiff) had been settled or closed by counter-trades prior to the month in which delivery could be made; up to April 19, 1882, no commodities had been delivered to or received on these trades, nor had any suggestion or requirement on the part of Mr. Barber to deliver been made; that defendant never reported to me the names of the parties with whom trades were made on my account, and that I never knew or inquired who such parties were; that, after the settlement in April, I commenced selling wheat for July delivery, and, by the last of May, had sold, through defendant, 100,000 bushels for that delivery, which are the trades in question in this case; that there was a corner in July wheat, and the price was forced up ten or twelve cents; that, on the last of July, I

came to Chicago, had an interview with defendant in the morning, in which he (defendant) proposed to make a tender of No. 2 red winter wheat, the kind sold being No. 2 spring wheat; that No. 2 red winter is intrinsically more valuable than No. 2 spring, but that, on the last of July, the former stood at 98 cents per bushel and the latter at $1.35 to $1.37; that I (plaintiff) knew of the tender, and I did not object; that I met defendant later in the day, and was informed by him that he had borrowed warehouse receipts for ten thousand bushels No. 2 red winter wheat, and had made a tender of the same to the several parties to whom he had sold the wheat, and that such tender was in every case declined, and that said tender was made under the following rules of the board of trade, viz.: ' On contracts for grain for future delivery the tender of the higher grade of the same kind of grain as the one contracted for shall be deemed sufficient, provided the higher grade of grain tendered shall not be of a color or quality that will depreciate the value of the other, if mixed.'

"Prior to December, 1879, I bought, through defendant, 100,000 bushels of corn for December delivery. I came to Chicago and defendant told me the deal had gone against me $4500, and he said I had to close it that day. The loss was that amount, and I paid it that day. No corn was delivered on either side. In January, 1880, I sold, through Barber, 20,000 bushels of wheat. My profit was $400. I did not take the profit, but sold more, and the deal went against me $2000, and I paid it up. I then commenced buying, and made $600 on March wheat bought in January. I commenced selling wheat in March, 1880, and made a good deal of money for a few months; recovered losses in April and commenced selling May wheat. The May options took a sudden start up, and I lost $8000, and I paid it. It was expressly stated by me to Barber that I wanted no property. He knew that. He said, ' Certainly, I know that,' and that the deals should be settled on the margins — on the profits. Up to April, 1882, nothing had been delivered by me or received by me, nor had there been any suggestion or requirement on defendant's part to deliver made; on the other hand, it was never expected to

handle the property, but merely to trade in the different deals. Up to the close of the July deal, 1882, no demand had been made on me by Barber for the delivery of wheat or corn, or any other commodity.

"That I received the following statement of account from defendant about the day of its date (which was read in evidence):

"'CHICAGO, *Oct. 30th,* '82.

"'A. S. Maltman (J. B. W.) in acc't with G. M. Barber,

| 1882. | | | | | | | Cr. | |
|---|---|---|---|---|---|---|---|---|
| July | 1. | By balance | . | . | . | . | . . | $12,000 00 |
| | 3. | " draft . | . | . | . | . | . . | 3,000 00 |
| Sept. | 11. | " profit as per statement rend. | | | | | . . | 931 25 |
| | 12. | " " " " " " | | | | | . . | 2,018 75 |
| | 27. | " . " " " " " | | | | | . . | 318 75 |
| Oct. | 26. | " " " " " " | | | | | . . | 300 00 |

"'DEBIT.

| July | 31. | To loss as per statement rend. | $2,668 75 | |
|---|---|---|---|---|
| Aug. | 11. | " " " " " " . | 100 00 | |
| Sept. | 12. | " draft | . . . . | 3,000 00 |
| Oct. | 27. | " loss as per statement rend. | 400 00 | |
| | 30. | " draft | . . . . | 987 50 |
| | | To balance . | . . . | 11,412 50 |
| | | | $18,568 75 | $18,568 75 |

Oct. 30. By balance, being diff. between price    . $11,412 50

"'I have 100 M July spring wh't sold for you and the settling price of same as fixed by board of trade (1.35), including coms., ¼c.'

"That the item of $12,000 balance in said account consisted of money advanced and paid to the defendant; that the item 'July 3d, by draft $3000,' consisted of $3000 money paid the defendant by means of a draft. Plaintiff testified further that on April 2d, 1883, I served the following notice upon the defendant, by delivering to him a copy thereof; the defendant

read the notice, admitted he had the money in his hands, but declined to pay it over.

" The notice was offered in evidence, and is as follows:

" ' To G. M. Barber, Esq.:

" ' In a statement made by you, dated October 30th, 1882, of deals made on my account on the board of trade, Chicago, you acknowledge a balance in your hands of $11,412.50 in my favor, being, so the statement says, the difference between price you sold 100 M July wheat for me and the selling price of same as fixed by the board of trade, $1.35, including your commission of ¼ cent; now you are hereby notified that I claim all contracts for sale of said wheat to be illegal and void, and forbid you to pay over any part of said money or balance to any one, and I further demand the immediate payment thereof to myself.

" ' Dated Chicago, April 2d, 1883.      JAMES B. WHITE.'

" On cross-examination plaintiff testified, that, during all the time he traded through defendant, Maltman continued to some extent to act as his agent in the business with defendant; that he received some profits debited to him in the statement offered in evidence; that defendant complied with his orders, so far as he knows; that he did not think defendant had any thing to do with the corner in wheat; that he (plaintiff) had nothing to do with the appointment of a committee by the board to fix a selling price for July wheat; that he knew what was going on, and talked with A. M. Wright and other members of the board of trade about the deal, but did not enter into any agreement or arrangement with the other brokers similarly situated to the defendant in regard to legal proceedings to prevent the consummation of the corner; did not employ counsel on behalf of defendant, or authorize any steps to be taken in his name; that he (plaintiff) was an outsider and was not recognized in that matter; that he did not agree to pay attorney's fees, but expected he would have to do so, and did after the litigation was over; that he knew a bill was filed; that the matter was contested and decided by

the Supreme Court in favor of the cornerers. The litigation was after a committee appointed by the board had fixed the selling price at $1.35.

"In the progress of the case the plaintiff testified further, among other things: I left it for Mr. Barber to put the contracts in form when I wished him to buy or sell. I understood that he would go on the board of trade and either buy or sell, and I understood that he did go on the board of trade and buy and sell according to my orders. There was no disobedience of my orders, so far as I know. I have no complaint to make on the score of non-observance of my orders. I knew that while we thought the corner in July wheat was about to culminate, buying wheat at Milwaukee or elsewhere to fill orders was talked about — a great many talked of it — but it was considered that parties who attempted that got beaten, because they simply dropped the grade on them. It is possible I may have talked with Maltman about the possibility of buying wheat in Milwaukee to fill my orders, but I never dreamed of it. I said some were doing it; some did do it. It was generally talked that some people had done it, and as to the propriety of doing it; it was only three cents, I think, to bring it from Milwaukee here, and twelve, fifteen, or twenty cents, somewhere along there, lower a bushel, and they could fill their contracts here with it and not lose so much as they would in the extortion of the corner. I might have said, 'Well, it could be done,' 'I wish I could do it,' or something of that kind. I knew Barber, being a member of the board of trade and making contracts on the board for me, would be obliged to observe the rules of the board. I understood there was a rule that one must keep his margin good. I told him to buy, and told him to sell, and told him to sell out, and when to cover and when to close trades, and he observed my orders. If there was any corner it was not my fault, as I was selling, and it was not from Barber's fault, so far as I know. After he made the tender of red winter wheat on the 31st of July, 1882, I approved of what he did. I went to see Mr. A. M. Wright, who was one of the parties proposing to file a bill to question the propriety or binding force of a finding of a

committee of the board of trade fixing the settling price for
July wheat. I saw published a communication in the paper,
an interview with the reporter, in regard to this corner, or at
least he published a communication and I went to see him and
consulted with him about it. The complaint was that the
price of July wheat was put too high on the 31st of July.
Barber had spoken about the contracts being under the board
of trade rules. After the culmination of the corner I got a
copy of the rules — printed copy. He showed me the rules
under which the committee was appointed. I think the rule
is on page 51 of Rules of 1882, § 3. Mr. Wright believed it
was a legal tender; so did I. I believed that ' red ' would be
a good tender. I went to see counsel; it was John E. Burke.
He was a lawyer who had charge of what he called contested
cases. There were some thirty-two members of the board in
contested cases, and Mr. Barber joined in with them. I footed
the lawyer's bill; that was all I did. I told Mr. Burke that I
was one of the fellows that got bled in this affair, and I did
not want to stand it if he could help it. He was seemingly as
much out of humor about it as I was, as far as the situation
was concerned — the unfairness of it. When it came to pay
for the expense of those legal proceedings, the bills were pre-
sented to Mr. Barber and Mr. Maltman, and I told them to
pay them, and I would pay them back; and I did. I went
with Mr. Wright to Mr. Burke. Mr. Barber was away from
home at the time. I told Mr. Burke the situation I was in,
and he said, ' Well, when your broker comes here, have him
come up and see me.' It was understood that Mr. Barber was
my broker or commission merchant, and, when he returned,
he went and joined in with the others, to contest this thing.
I knew how the matter progressed after that. It was con-
tested in the courts in some formal way, to get into the
Supreme Court. There was a *pro forma* decision in the court
here, and the case was taken to the Supreme Court and was
there determined in favor of the cornerers. That was after
the committee of the board of trade appointed under these
rules had been appointed. The case went to the Supreme
Court. We simply had to have patience to wait until they

determined it. They determined it about a year ago last Jan-
uary — that is, in January, 1883 — before I had served notice
on him. In most cases where I bought or sold I closed before
the end of the month in some way — either sold out or cov-
ered it. If I bought wheat of a man for the month of July
he had the whole month of July in which to tender to me.
During the whole of the month of July I had an option at
what time I would deliver. The buyer has to close his trade
the first of the month, and the seller has to the last of the
month, or, if he pleases, he can close between times.

" George M. Barber, defendant, who, being first duly sworn,
testified as follows : That, after the notice was served upon
him, by plaintiff, in April, 1883, he paid over to the various
parties to whom he had owed the wheat in question, the sum
of $11,412.50, less the amount of his commissions, which were
$250 ; and, on cross-examination, that he made such payment
because charges had been preferred against him, and he had
to pay or be suspended from the board.

" Plaintiff here rested his case, and the defendant, to main-
tain the issues on his part, introduced the following :

" George M. Barber, defendant, who, being recalled, testified
that he was a commission merchant and member of the board
of trade ; that he was employed by Maltman to trade for
plaintiff on the board of trade — to make trades there ; that,
in executing the orders of plaintiff, he dealt with other
members of the board ; that he did not seek commission
business, but dealt mostly on his own account ; that once,
when White was hanging on to a deal which had gone against
him, witness told him that witness never hung on to a deal,
but, in his own trades, generally calculated, when he went
home at night, to have an equal amount bought and sold,
so that he would not be affected by the fluctuations of the
market, but did not say to Mr. White that White's business
would be conducted in that way. Witness had to be governed
by White's orders, which were to do so and so ; did not
recollect plaintiff saying that he wanted to gamble on the
board; that the manner of making trades on the board is as
follows : If the order was to sell, he would go on the board

and offer to sell so much wheat at such a price, and some other broker would accept the offer, or some other broker might offer to buy, and he (defendant) would accept the offer, and thereupon both parties made a memorandum of the trade on a card, without comparison; that such memorandum was usually as follows, (referring to a card,) this being one of the trades in question: '10 M, July, H. G. Gaylord, 1.25⅛, J. B. W.;' that this was the only writing made in the hurry of business on the board; that '10 M' meant 10,000 bushels; 'July' meant for delivery in July, at the seller's option; that No. 2 spring wheat was understood; that 'H. G. Gaylord' was the name of the broker to whom the sale was made; that '1.25⅛' denoted the price, and the initials 'J. B. W.' indicated that the sale was on account of plaintiff; that their trades were afterwards, on the same day, entered on the books of the respective parties, and their clerks went round and compared and checked them off; that this was the case with the sales of 100,000 bushels for delivery at seller's option during July, 1882 (the deals under consideration); that he had no different agreement with any of the persons with whom he dealt for plaintiff; that the grain was to be delivered or received; that 'puts' and 'calls,' or mere options to buy or sell, were not recognized on the board; that it is customary where a commodity is sold to and bought of the same broker, upon different orders, for the brokers to settle their trades by paying the difference, as the case may be. (And a rule of the board of trade allowing such transfers was read in evidence.) That he never told plaintiff that trading on the board was illegitimate, but may have told him many other of the trades were settled up, or offset, without delivery. The volume of transactions was too large to make delivery practicable in all cases. As to the conversation between witness and White, November 30, 1879, witness stated he believed it was the first time he met White, for whom there were then to mature contracts to buy 100,000 bushels corn, and witness told White that the chances were strong that the corn would be delivered, and he must either furnish the money to pay for it or order him to sell it, so that he would have a place to put it, when delivered,

or could make arrangements to transfer it; that, in the contracts for Mr. White, witness had received and delivered property; had received as high as 60,000 bushels in a day; that, at the request of plaintiff, he did not settle the deals for July, but made default as to the 100,000 bushels. Mr. Maltman, for Mr. White, gave me the draft of $5000, June 12, 1882. I was required to give my word that I would not buy in the wheat unless by his orders, but would allow him to default, and Maltman told me that White said he would settle — let the committee fix the price and he would settle that way, if possible, if he did not decide to buy in the wheat. White sent witness a telegram from Fort Wayne, Aug. 5th, 1882, as follows: 'Don't cancel the July trades. My attorneys here believe the tender we made is good and can be enforced. J. B. White.' (Telegram read in evidence.) There were about thirty other brokers who made default; that a committee was appointed in accordance with the rules of the board, who fixed the settling price at $1.35; that thereupon the brokers filed bills in court, to enjoin the board from suspending them for not settling at the price fixed by the committee; that he returned to the city about September 10th, 1882, after being absent a month or more, and was informed by Maltman that the plaintiff had made arrangements for him to join in the injunction proceedings; that the next day he went to the office of J. E. Burke, the attorney for the defaulting brokers, and signed and swore to a bill for the purpose above stated; that said bill was filed; that afterwards the Supreme Court rendered a decision adverse to the prayer of the bill, and the bill was dismissed; that plaintiff was informed of the result, and paid the attorney's fees and damages in the case; that plaintiff did not suggest the making of any further contest; that at the time plaintiff made the demand upon him, April 2d, 1883, the money in question was under his control, except $6700, which had been deposited in the bank as margins, on account of some of the deals; that he frequently received and delivered grain; had received as high as 60,000 bushels in a day; that he could not recall any trade in which he bought for Mr. White where he received any commodity, but had no doubt

at all in all his tradings he did receive a good deal, but could not recall any particular instance. There was a certainty that delivery would be made, unless, after the trades were made, I made offsets. I always do get more or less; do not expect it will all be delivered. I expect I can offset trades with a good part of it. When the 100,000 bushels in question were sold, witness expected it would be delivered; that he would buy here in the market, the largest grain market in the world.

"Thomas W. Burns, being duly sworn, testified for the defendant, that, in 1882, he was a member of the firm of Ulrich, Busch & Co., and a broker on the board of trade; that, on May 17, 1882, he bought of defendant, for his firm '5, July, wheat, at 1.24⅜,' No. 2 spring wheat (5000 bushels); that the contract was made in the regular way; that there was no secret understanding or agreement that it was not to be executed, or that it was to be settled; that the wheat was to be delivered at any time in July, at the seller's option.

"Abel H. Bliss, being duly sworn, testified for defendant, that he was a member of the board of trade, and was doing business as a commission merchant in 1882; that in May he bought 10,000 bushels July wheat (No. 2 spring, deliverable at seller's option at any time during July), of defendant, which he never received; the wheat was to be delivered in July, at the seller's option; that there was no agreement that the wheat was not to be delivered, or that it was to be settled; that he certainly expected to get the wheat.

"It was admitted that the other brokers to whom defendant had sold the wheat in question would testify in a similar way, as to the trades with them, respectively.

"Alexander S. Maltman, being sworn, testified for defendant, that he was of the firm of A. S. Maltman & Co., and was engaged in the commission business in Chicago; that he acted as agent for plaintiff, in his transactions with defendant; that he never told defendant that the transactions were to be of a gambling or fictitious character; that his instructions from plaintiff were for the most part contained in telegrams and letters, and these he gave or showed to defendant; that the transactions were quite continuous; that, in July, 1882, he

had several conversations with plaintiff as to Barber defaulting; that, when the price was up in the thirties, plaintiff was unwilling to advance more margins unless defendant would agree to default, and that he procured such an agreement from the defendant at the request of plaintiff; that, after default had been made, plaintiff said he was willing to leave it with the committee to be appointed by the board; that he went with plaintiff to the office of Burke, the attorney; that plaintiff went there to get out an injunction to prevent the board of trade from suspending defendant; that he paid out for plaintiff on account of the said suit $283.50, which plaintiff had repaid him.

"George F. Morcom, who, being duly sworn, testified for defendant, that he was of the firm of A. S. Maltman & Co.; that he heard plaintiff say that the tender of No. 2 red winter wheat was good; that, according to their own rules, they were bound to accept it; that plaintiff said that he desired Mr. Barber to default on the deals and let the matter go to a committee and let them fix the price, and said that he would see that Mr. Barber was protected.

"Deville C. Bannister, being duly sworn, testified for defendant, that, during the time in question, he was book-keeper for defendant; that plaintiff, at the time the injunctions were being obtained, went to Mr. Burke's office to see about the matter, and said he wished he would take the matter into his own hands; that Mr. Barber did not pay over the money until it was necessary to do so in order to save himself from being suspended from the board.

"The bill in chancery above referred to, being a bill filed in the Superior Court of Cook County, by George M. Barber, in the interest of or for the benefit of the plaintiff, on the 11th of September, 1882, making the Board of Trade of the City of Chicago party defendant, was, together with a copy of the injunction issued in pursuance of the writ, read in evidence. It set forth certain sections of the charter of the board of trade, and referred to a copy of the rules of said board in force January 1st, 1882, making such copy a part of the bill as an exhibit, and referred also to sales of No. 2 spring wheat, made

by defendant for delivery in July, 1882, and alleged that there was an unlawful combination to prevent the complainant and others situated like him from fulfilling their contracts, &c., and set forth a certain rule of the board of trade providing, among other things, for the appointment of a committee to determine disputes as to the price of property, in case of supposed excessive claims for damages being made under contracts, on default, &c., and showed that application for the appointment of such committee was made with reference to the defaults made upon contracts for delivery of No. 2 spring wheat in July, 1882, and showed that the committee determined the price for settlement at $1.35 per bushel; and the decision of the committee was drawn in question by the bill upon various grounds, not drawing in question the validity of the contracts, but questioning whether the board of trade had power to compel members to abide the decision of such committee, and also questioning the regularity of the appointment of the committee, and charging that, in the conduct of the hearing had before the committee, and in the finding of the committee, the spirit of the rules of the board of trade was violated by putting it in the power of persons who had been concerned in cornering the market to get excessive damages, &c. The bill pointed out certain rules of the board of trade under which, in case a member failed to comply promptly with the terms of any business contract or obligation, or failed to satisfy, adjust, and settle the contract, or failed to comply with or fulfil any award of the committee of arbitration, or committee of appeals, made in conformity with the rules, regulations, and by-laws of the association, he should, upon admission or proof of the delinquency before the board of directors, be subject to be suspended from all privileges of the association, &c.; and an injunction to prevent suspension or expulsion, and especially to restrain and enjoin the board from accepting, treating, or recognizing the decision of the committee aforesaid as in force, or as having any effect, was prayed for by the bill. Such injunction was ordered, and was issued September 11, 1882, and was served on the board. There was also introduced a certified transcript of the order of said superior court, made on the 11th of October, 1882, dis-

solving the injunction, and assessing damages on account of the issuing of the same, but showing, that, by stipulation, the cause was to abide the final result of the case of *Abner N. Wright et al.* v. *The Board of Trade of the City of Chicago,* in the appellate court or in the Supreme Court, and that, in case of the reversal of the decree in that case, then the decree in the Barber case should be set aside on his motion, and the injunction in his favor was continued. This decree was to be regarded as final in case the decree in the Wright case should be affirmed, except that, in such case, the injunction was to be dissolved, on defendant's motion. The transcript further showed, that, on the 16th of April, 1883, the said superior court, in the said chancery suit of Barber, vacated the order to continue the injunction, and the bill thereupon stood dismissed under the previous order of the court, this being because the Supreme Court had, in the case of Wright, affirmed the decree of the superior court dismissing his bill. It appeared that, after the decision of the Wright case, inquiry was made of the plaintiff as to whether he wished anything further done in reference to the prosecution of the chancery suit in the name of Barber, and he replied, 'Further appearance not necessary.'

"It further appearing, from the testimony, that the plaintiff paid the damages which were assessed against Barber on account of the issuing of the injunction, the testimony of the witness Barber tended to show, that, at the time of the delivery by defendant to the plaintiff of the statement aforesaid, dated October 30th, 1882, the balance of $11,412.50 therein mentioned, that amount being the difference between the price at which the one hundred thousand bushels of wheat were sold for July delivery, and $1.35 per bushel, the settling price so fixed by the committee — that is, the difference over and above the commissions of $\frac{1}{4}$ of a cent per bushel charged by the defendant — was to remain with the defendant, to await the action of the court upon the aforesaid bill in equity, seeking to impeach the decision of the committe fixing the settling price, and that, after that matter had been litigated in the courts, through the suit so brought in favor of Wright, which was made a test case, complaints were made before the board of

directors of the board of trade, against the defendant, on account of default on his part in performing or settling the contracts for the sale of the said one hundred thousand bushels of wheat, notice of one or more of which complaints were given by defendant to plaintiff, and the defendant appeared before the directors to make defence, but did not succeed in making any defence, and, being about to be suspended unless he settled, did thereupon settle by paying according to the decision of the committee declaring $1.35 per bushel to be the settling price, so that the moneys paid out by defendant, together with his commission, exhausted the said sum of $11,412.50; and this was prior to the commencement of this suit, but after the notice of April 2d, 1883, above set forth; the testimony tended to show that this money was left in defendant's hands by Mr. White, when the aforesaid statement of account stating said balance, &c., was given by defendant to the plaintiff, and was so left for the protection of the defendant, as to the contracts, with reference to the litigation arising as to whether the decision of the committee should be allowed to be binding in regard to the settling price."

On the foregoing evidence, the plaintiff claimed to recover the before named sum of $11,412.50, as money placed by him in the hands of the defendant for the purpose of dealing in gambling contracts at the Chicago Board of Trade, and which contracts, it was asserted, were made illegal by a statute of Illinois.

The court charged the jury among other things, as follows: "The question of fact for you to determine under the proof is, whether these dealings made by the plaintiff on the board of trade, through the defendant, as his broker, were gambling contracts, within the meaning of the law. The statute of the State of Illinois upon the subject I will now read you.' Section 130 of c. 38 " (Rev. Stat. of Illinois, by Hurd, ed. of 1883, p. 394; ed. of 1885, p. 405,) " reads as follows: 'Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price

of commodities therein, or corners the market, or attempts to
do so in relation to any of such commodities, shall be fined
not less than $10 nor more than $1000, or confined in the
county jail not exceeding one year, or both; and all contracts
made in violation of this section shall be considered gambling
contracts, and shall be void.' The plaintiff contends that the
contracts in question, made by the defendant for him and in
his behalf, were gambling contracts, within the meaning of
this law. The question then arises, What kind of contracts
are prohibited by this statute? You will notice the language
is, 'Whoever contracts to have or give to himself or another
the option to sell or buy, at a future time'—an option to sell
or buy at a future time. The courts have construed to some
extent the meaning of this statute, and I will read from a case
decided by the Supreme Court of this State the construction
which is there given upon it: 'The evidence in this record is
by no means conclusive that the contracts for grain, made by
defendants for plaintiff, were unlawful. They were made in
the regular course of business, and, for anything that appears
in this record, they could have been enforced in the courts.
It is true, they were time contracts—that is, the seller had
all of the month in which to deliver the grain; but the testi-
mony of Wolcott is, they were *bona fide* contracts for the
actual purchase of the grain. The only option the seller had
was as to the time of delivery. The obligation was, to deliver
the grain at all events, but it was the seller's privilege or option
to deliver it at any time before the closing of business on the
last day of the month. Time contracts, made in good faith,
for the future delivery of grain or any other commodity, are
not prohibited by the common law nor any statute of this
State, nor by any policy beneficial to the public welfare.
Such a restraint would limit commercial transactions to such
a degree as could not but be prejudicial to the best interests
of trade. Our present statute was not in force when these
dealings were had; consequently, the rights of the parties
are not affected by it. What the law prohibits, and what is
deemed detrimental to the public interests, is, speculations in
differences in market values, called, perhaps, in the peculiar

language of the dealers, "puts" and "calls," which simply means a privilege to deliver or receive the grain, or not, at the seller's or buyer's option. It is against such fictitious gambling transactions, we apprehend, the penalties of the law are levelled.'" The above extract is taken from the opinion of the Supreme Court of Illinois in *Wolcott* v. *Heath,* 78 Ill. 433. The Circuit Court then proceeded in its charge as follows: "Now, the question is, in the light of the testimony in this case, whether the contracts in question in this case were contracts to buy or sell at a future day, or whether they were simply absolute sales, in which the seller had the entire month, the month specified, in which to perform his contract. This court has found it necessary, on several occasions, to construe this statute, and has held, with the case which I have just read, that the statute is levelled against what are called puts and calls, that is, the right or the privilege which a party may have to buy or sell of you at a future day, not an absolute agreement now to sell, but where one man pays another $5 or $10 for the privilege of delivering to him 1000, 5000, or 10,000 bushels of grain at a future time, or pays him a similar amount for the privilege of buying or accepting from him grain at a future time — a contract which cannot be enforced in terms, because it is wholly at the option of the party holding the option whether he will call for the grain or not. This is what is termed a gambling contract, or a put or call, or an option to buy or sell at a future time, within the meaning of the Illinois statute."

The bill of exceptions further says: "And the court further explained to the jury that the ' option to buy or sell,' prohibited by § 130, c. 38, of the Revised Statutes, means a privilege which the buyer or seller may or may not exercise at his option, and that a contract by which the seller absolutely agrees to deliver a certain commodity to the buyer within a specified time, when the only option is as to the delivery within a certain time, such as within the whole of some month named, is not a gambling contract, within the meaning of this statute."

There were other instructions to the jury, the entire charge

covering nearly seven printed pages of the record. The bill of exceptions states that the plaintiff excepted to all of the instructions given, and especially to those hereinbefore set forth.

The second case above named is a suit in equity, brought on July 24, 1883, in the Circuit Court of Cook County, Illinois, by the Bank of British North America, a corporation of Great Britain, against James B. White and George M. Barber. The bill alleges that the bank has on deposit, in its office at Chicago, Illinois, $6700, standing to the credit of Barber, the same having been deposited by him as security for certain trades or deals in wheat with members of the board of trade of Chicago, the money having been turned over to the plaintiff by the Merchants' Bank of Canada, to whose business at Chicago the plaintiff succeeded; that White claims that said money belongs to him, and claims that Barber, in depositing it, acted merely as the agent of him, White; that, on April 2, 1883, White made a demand upon the plaintiff for the money, and forbade it to pay the money, or any part thereof, to any person except upon the order of him, White; that White had commenced an action against the plaintiff to recover the money; and that Barber had demanded of the plaintiff that it should pay the money to him. The bill prays that the defendants may interplead and settle the controversy, and that the plaintiff may be allowed to pay the money into court. Both of the defendants appeared in the suit. White put in an answer setting up that the $6700 was part of a larger sum of money placed by him in the hands of Barber to be used by Barber as margins in gambling contracts which Barber was to make for him on the board of trade in Chicago; that Barber, in pursuance of such employment, and in April, May, and June, 1882, made certain gambling contracts with members of the board of trade, which contracts were ostensibly for the sale of certain quantities of wheat by Barber to such members, to be delivered at any time in July, 1882, at the option of the pretended purchaser, but such pretended contracts were a mere form and cover, and the real intention of all the parties was to settle them by a payment of the difference between the price

for which the wheat was sold and the market price of the same when delivery thereof should be called; that Barber took $6700 of the money of White, so placed in his hands, and deposited the same with the Merchants' Bank of Canada, as security for certain of such pretended contracts, being the same $6700 turned over to the plaintiff by the Merchants' Bank; and that, while the money was still in the possession of the plaintiff, and on April 2, 1883, White notified both the plaintiff and Barber not to pay the same to any one but White.

Barber also answered the bill, and in his answer made the following allegations: He was not the agent of White in depositing the $6700. As a commission merchant at Chicago, he made certain sales and purchases of grain and pork, for future delivery, at the instance and request of White, being, as between himself and those with whom he made the contracts, responsible for the performance of them on his part. A large number of such transactions occurred in May, June, July, August, September, and October, 1882. Barber was doing business on the Board of Trade of Chicago, of which he was a member, and White was living at Fort Wayne, in Indiana. The contracts were made with reference to the rules and regulations of the board of trade, and to the usages of business on that board; and, by those rules, the persons with whom Barber made such contracts were authorized to demand margins and deposits, as security for the performance of the contracts by Barber, and in various instances such demands were made, and it became necessary for Barber to make deposits for margins or security with reference to the contracts. Those rules provided, that, on time contracts, purchasers should have the right to require of sellers, as security, ten per cent margins, based upon the contract price of the property bought, and further security, from time to time, to the extent of any advance in the market value above that price; also, that sellers should have the right to require as security from buyers, ten per cent margins on the contract price of the property sold, and, in addition, any difference that might exist or occur between the estimated value of said property and the

price of sale.  The rules also provided, that securities or margins should be deposited either with the treasurer of the board of trade, or with some bank authorized to receive the deposits. The rules also prescribed the form of certificate to be used by the bank, which form was adopted by the Merchants' Bank of Canada and by the plaintiff.  In accordance with those rules, the certificates showing the deposits were issued in duplicate in each case, one being marked "original" and the other "duplicate," and both being marked "not negotiable or transferable."  The certificates were not made with express reference to any particular contract, and the deposits were subject to be treated as security for the fulfilment of any contracts made between the parties to the respective certificates, during the time the deposit remained unpaid.  During May, 1882, Barber, at the instance and request of White, made contracts for the sale and delivery by Barber to divers persons, members of such board of trade, of large quantities of No. 2 spring wheat, for delivery at seller's option during July, 1882, at certain prices specified in the various contracts, ranging from $1.22$\frac{1}{2}$ per bushel to $1.25$\frac{1}{8}$ per bushel, which wheat was to be delivered in lots of 5000 bushels.  White did not put Barber in funds to buy wheat for delivery according to the contracts.  While Barber remained liable upon the contracts, he was, from time to time, called upon to deposit margins on account of the contracts, to secure their performance, and did, in accordance with the rules of the board of trade, and in compliance with his duties under the contracts, make deposits of money and procure certificates therefor from the Merchants' Bank of Canada. The answer then gives the particulars of twelve different certificates for such deposits on various contracts, amounting in the aggregate to $6700. The contracts for the delivery during July, 1882, of No. 2 spring wheat were not performed by White.  The moneys deposited as margins were furnished by Barber in large part from his own means, for the purpose of keeping the contracts open, as was desired by White.  Barber also, in order to avoid loss by White and to protect the interests of White, made, before the close of July, 1882, a tender of No. 2 red winter wheat under the contracts, which wheat

was of greater intrinsic value, as Barber believed, than No. 2 spring wheat; but the tender was rejected by the purchasers, on the ground that the wheat tendered was not of the kind and grade contracted to be delivered, nor such as, under the rules of the board of trade, was necessary to be delivered. The parties with whom the contracts had been made, and who had the right to call for delivery, made large claims for damages against Barber, and insisted that the tender was irregular and insufficient; and White desired Barber to object to the payment of such claims, and to reduce the same, if he could. With this object in view, Barber, at the instance of White, filed a bill in chancery, in the Superior Court of Cook County, on September 11, 1882, against the board of trade, seeking by the bill to impeach the regularity and fairness of an award or decision of a committee which had been appointed, under the rules of the board of trade, to determine the settlement price under contracts such as those which were so made by Barber, and which committee had determined that such settlement price should be $1.35 per bushel. The bill also sought to restrain the board of trade from enforcing such award or disciplining Barber on account of non-compliance therewith. An injunction was temporarily granted on the bill. The award made Barber liable to pay, as damages, to the parties with whom he had made the contracts, the difference between the contract price and the settlement price of $1.35 per bushel. The Superior Court of Cook County adjudged, in the suit, that Barber was not entitled to any relief on account of any of the matters stated in the bill, and the injunction was dissolved on April 16, 1883. The bill was drawn up by counsel employed by White, White knowing that if the injunction should be dissolved Barber would be required to settle on the basis of the award of the committee. With reference to that basis, White drew from Barber, on October 30, 1882, $987.50, as an excess of money, including profits, due to him from Barber after reserving enough to pay damages at that rate. Prior to the bringing of the suit in chancery, it was the right of the parties with whom Barber had entered into the contracts, to have the

moneys which had been deposited as margin or security under the contracts, paid over to them on the order of the president of the board of trade, they holding, respectively, duplicates of the certificates; and Barber, on making default as to the delivery, became amenable to discipline under the rules of the board of trade, for not complying with the terms of the contracts. One of those rules provided, that, when any member of the association failed to comply promptly with the terms of any business contract or obligation, and failed to equitably and satisfactorily adjust and settle the same, he should, upon admission or proof of such delinquency before the board of directors, be by them suspended from all privileges of the association until all his outstanding obligations to members of the board of trade should be adjusted and settled. The parties who were entitled to delivery of the wheat under the contracts for delivery in July, 1882, were, by those rules, entitled to settlement with Barber at the average market price of the commodity on July 31, 1882, the day of the maturity of the contracts, and the damage or loss due to such purchasers by reason of the required settlement became thereupon immediately due and payable by Barber to such purchasers; but the payment was delayed because of difference of opinion as to the amount of damages, and in order to enable White to obtain, if possible, a reduction of them; and this was the object of the suit in chancery against the board of trade. It was also, under those rules, the right of such purchasers, after a failure for three business days succeeding the maturity of the contracts, to cause to be submitted to a select committee of three members of the board any dispute between Barber and such purchasers, with reference to any deposit of moneys applicable to the contracts; and the decision of a majority of the committee, reported to the president of the board, would have determined in what manner and to whom the deposit should be paid; and thereupon the president would have been authorized by the rules, to make an order for the payment of the deposit in accordance with the decision of the committee, which order would have been a sufficient warrant to the bank by which the certificates were issued, to pay the money in

accordance with the order; but action before the board, as against Barber, was postponed because of the injunction, and the certificates of deposit for margin and security, so issued, having reference to such wheat contracts, were held over in view of the injunction. After its dissolution, the payment of the margins or security moneys represented by the certificates was subject to be enforced under the rules of the board of trade, and Barber was in danger of being suspended from the privileges of the board because of the non-settlement of the contracts. White had due notice of all the foregoing facts, but failed to protect Barber or to give him any guarantee for his protection. The liability to suspension from membership of the board of trade was one of great consequence to Barber in a monetary point of view, as well as with reference to his standing and reputation as a merchant, for such suspension would have operated as practically a forfeiture of his membership, so long as the contracts remained unsettled. The fee for membership was fixed by the rules of the board at $10,000, and any permanent suspension of Barber from the membership of the board would have caused a loss to him of even more than $10,000, because it would have interfered with his livelihood and business. He could not, consistently with his rights or duties as a member of the board, defer an adjustment or settlement of the contracts any longer than was necessary to determine what he would, under the rules of the board, be required to do in respect to such settlement. In order to accommodate White as far as possible, Barber delayed making settlement until after complaint was made against him before the board in pursuance of its rules; and he allowed the complaint to proceed to a hearing, at which he attempted to make defence as to one of the contracts, setting up, among other matters, such tender of No. 2 red winter wheat; but the board ruled against him and was about to direct his suspension from membership unless he made settlement. Thereupon, on the 24th of April, 1883, he settled such of the contracts as were then outstanding, making such settlement in accordance with the rules of the board, and, on his making it, the deposits for margins and security, pertaining to

the contracts, were liberated, and, on the return to the bank of the original margin certificates, so issued by the Merchants' Bank of Canada, the certificates being endorsed to the bank, it gave to Barber credit for the moneys on his account as a depositor in the bank. White caused Barber to make the contracts and to become bound for their performance, and made it necessary for Barber to put up margins and security, and thus placed it out of the power of Barber to control such margins and security in any other way than according to the rules of the board of trade, and also so involved Barber, in causing him to become amenable to discipline by or suspension from the board of trade, that White could not legally or equitably revoke the authority of Barber to make settlement of the contracts or pay over the moneys when it became necessary to settle the contracts. The contracts were legal, and the provisions of the rules of the board of trade, applicable thereto, were binding upon Barber, and were necessary and proper to be considered with reference to his duties and rights, as between himself and the other contracting parties, and as between himself and White. Barber avers that it was his right to pay damages or differences on default under the contracts, when such damages became due according to the rules of the board of trade ; that such right enured to him by direct authority from White, when the contracts were made at the instance of White and the moneys were paid or advanced to Barber; and that thereafter there was no time when White had any right or authority to revoke the power to pay over the moneys, when, in the course of trade, or in accordance with the rules of the board of trade, it became necessary to pay them over, in making settlement of the contracts on which White defaulted, and which it became necessary for Barber to adjust, because he had become a party thereto at the instance of White; that the contracts in question were but a small part of the dealings which were had by White through Barber, as his commission merchant, with various members of the board of trade; that, in many of those dealings, which were carried on contemporaneously with the dealings in question, there was profit to White, and White

received from Barber, on account thereof, large sums of money, representing such profits; and that it would be inequitable for White to claim that he should be relieved at the expense of Barber from the effects of the contracts for the delivery of No. 2 spring wheat in July, 1882, which remained open at the close of that month because of the non-fulfillment thereof on the part of White, while White had received profits from other contracts of a similar character, made for him by Barber, which White chose to have settled and closed, when the same resulted in profits which were to be paid to White by Barber.

Replications were put into these two answers, and, in January, 1884, the suit was removed by Barber into the Circuit Court of the United States for the Northern District of Illinois. Afterwards, it was stipulated that the money might remain in the hands of the bank until the final disposition of the cause, subject to like order by the court as if the money were paid into the registry of the court, and an order was made dismissing the bank from the litigation, as well in the suit at law commenced against it by White, as in the interpleader suit.

By a further stipulation, made in May, 1884, the testimony taken in the suit at law before mentioned, of White against Barber, to recover the $11,412.50, at the trial which took place in February, 1884, was used and introduced by the party taking the same, as his testimony on the trial of the suit in equity. Such testimony consisted of the detailed examination of the witnesses examined on the trial of the suit at law, and of documentary testimony, the substance of which examinations and documentary testimony is given in the bill of exceptions in the suit at law, and is hereinbefore recited. To this were added, in the suit in equity, the further depositions of White and Barber, taken therein in May, 1884. In these supplementary depositions, each party goes over with greater particularity the matters previously testified to by him, as set forth in the bill of exceptions; but nothing is substantially added throwing light upon the merits of the dispute. By the same stipulation there was put in, as part of the testimony on behalf

of Barber, a copy of the proceedings and judgment in the suit at law above mentioned, brought by White against Barber, to recover the $11,412.50.

In May, 1884, a final decree was made in the suit in equity, adjudging that Barber was entitled to the $6700, and ordering that it be paid to him. From that decree White has appealed to this court.

*Mr. L. M. Ninde* for plaintiff in error cited in both cases: *Tenney* v. *Foote*, 95 Ill. 99; *Pickering* v. *Cease*, 79 Ill. 328; *Beveridge* v. *Hewitt*, 8 Bradw. App. Ill. 467; *Lyon* v. *Calbertson*, 83 Ill. 33; *Calderwood* v. *McRea*, 11 Bradw. App. Ill. 543; *North* v. *Phillips*, 89 Penn. St. 250; *Barnard* v. *Backhaus*, 52 Wis. 593; *Cobb* v. *Prell*, 15 Fed. Rep. 774; *S. C.* 5 McCrary, 80; *Grizewood* v. *Blane*, 11 C. B. 526, 538; *Brun's Appeal*, 55 Penn. St. 294, 298; *Kirkpatrick* v. *Bonsall*, 72 Penn. St. 155; *Lyons Nat. Bank* v. *Oskaloosa Packing Co.*, 66 Iowa, 41; *Gregory* v. *Wattowa*, 58 Iowa, 711; *Murry* v. *Ocheltree*, 59 Iowa, 435; *Pearce* v. *Foote*, 113 Ill. 228; *Flagg* v. *Baldwin*, 38 N. J. Eq. (11 Stewart) 219; *Love* v. *Harvey*, 114 Mass. 80.

*Mr. Thomas Dent* in the case at law cited: *United States* v. *Central Pacific Railroad*, 118 U. S. 235; *Lehman* v. *Strasberger*, 2 Woods, 554; *Gregory* v. *Wendell*, 40 Mich. 432; *Williar* v. *Irwin*, 11 Bissell, 57; *Irwin* v. *Williar*, 110 U. S. 499, 508; *Clarke* v. *Foss*, 7 Bissell, 540; *Kent* v. *Miltenberger*, 13 Missouri App. 533; *Pennock* v. *Dialogue*, 2 Pet. 1, 16; *Express Company* v. *Kountze*, 8 Wall. 342; *Holliday* v. *Rheem*, 18 Penn. St. 465; *S. C.* 57 Am. Dec. 628; *Deal* v. *Bogue*, 20 Penn. St. 228; *S. C.* 57 Am. Dec. 702; *Walbrun* v. *Babbitt*, 16 Wall. 577; *Decatur Bank* v. *St. Louis Bank*, 21 Wall. 294; *Shutte* v. *Thompson*, 15 Wall. 151; *Warren* v. *Hewitt*, 45 Geo. 501; *Wyman* v. *Fiske*, 3 Allen, 238; *S. C.* 80 Am. Dec. 66; *Thacker* v. *Hardy*, 4 Q. B. D. 685; *Read* v. *Anderson*, 10 Q. B. D. 100; *Denton* v. *Jackson*, 106 Ill. 433; *Wright* v. *Board of Trade*, 15 Chicago Legal News, 239; *Thorne* v. *Prentiss*, 83 Ill. 99; *Nickalls* v. *Merry*, L. R. 7 H. L. 530, 539; *Patterson* v. *Clark*, 126 Mass. 531; *Yates* v. *Foot*, 12 Johns. 1; *Ruckman*

v. *Pitcher,* 1 Comst. 392, 402; *Love* v. *Harvey,* 114 Mass. 80; *Wolcott* v. *Heath,* 78 Ill. 433; and, in the Equity cause, in addition, *Ex parte Rogers,* 15 Ch. Div. 207; *Kirkpatrick* v. *Adams,* 20 Fed. Rep. 287; *Bangs* v. *Hornick,* 30 Fed. Rep. 97; *Roundtree* v. *Smith,* 108 U. S. 269; *Gilbert* v. *Gauger,* 8 Bissell, 214; *Jackson* v. *Foote,* 12 Fed. Rep. 37; *Higgins* v. *McCrea,* 116 U. S. 671.

Mr. Justice Blatchford delivered the opinion of the court.

The only question involved in the suit at law is as to the correctness of the charge to the jury in the particulars specially excepted to. The proper construction of the statute of Illinois, § 130 of c. 38 of the Revised Statutes, was determined by the Supreme Court of Illinois, in *Wolcott* v. *Heath,* 78 Ill. 433, in the passage from the opinion in that case quoted by the Circuit Court in its charge to the jury. According to that construction, the contracts for the sale of No. 2 spring wheat, deliverable in July, 1882, made by Barber, were not void as gambling contracts, if they were *bona fide* contracts for the actual sale of grain, and if the only option the seller had was as to the time of delivery, the obligation assumed by Barber being to deliver the grain at all events, with the option only to deliver it at any time before the close of business on the last day of July, 1882. That the contracts made by Barber were of that character, and were not such gambling contracts as the statute denounces, must be held to have been found by the jury under the portions of the charge specially excepted to, and under other portions of the charge contained in the record. The plaintiff did not pray for any instructions to be given to the jury, nor did he present to the court any propositions of law which he maintained the court should lay before the jury as guides to a proper solution of the questions in controversy. The general exception to the whole of the charge cannot be regarded, as it is a violation of Rule 4 of this court.

In its charge to the jury, the Circuit Court explained fully to them the theory of White, that the dealings on account of

which Barber paid out the moneys in question were, as between White and Barber, gambling or wager contracts and, therefore, illegal. It presented fairly to them a statement of the testimony on both sides of that question, as set forth in the bill of exceptions. It also submitted to them the question whether, in view of the testimony, the contracts in question were contracts to buy or sell at a future day, or whether they were absolute sales, in which the seller had the entire month of July, 1882, in which to perform his contracts; and it instructed them that if they should find that the dealings by the defendant for the plaintiff were options to buy or sell at a future day, their verdict should be for the plaintiff, but that if, on the contrary, they should find that such dealings were contracts by which the grain was to be absolutely delivered during the month of July, 1882, the only option being the time when, during the month, the delivery should be made, their verdict should be for the defendant. This charge was very favorable to the plaintiff, for it necessarily involved an affirmation of the propositions, that the plaintiff had a right to revoke his action in advising the tender of the No. 2 red winter wheat in fulfillment of the contracts, and had a right to revoke his express or implied assent to the appointment of the committee, under the rules of the board of trade, to determine what was a fair settling price for the wheat on the 31st of July, 1882, and had a right to recall his connection with the chancery suit brought by Barber against the board of trade, in which the validity of the contracts was recognized, and had a right to ignore the fact that he had placed Barber in the position in which, at the time of the giving of the notice of April 2, 1883, by White to Barber, Barber was not at liberty to refuse payment of the damages arising out of the non-fulfillment of the contracts, but was in danger of being expelled from the board of trade, if he persisted in such refusal.

The jury must have found, on the testimony, that the contracts made by Barber for the plaintiff at the board of trade were valid contracts, and that Barber was liable on them to either deliver the grain or pay the damages in case he failed

to deliver, because the court charged the jury, that, if the proof satisfied them that, by the contracts, Barber was liable to either deliver the grain or pay the damages, then the contracts were not gambling contracts, and they should find for the defendant.

We find no error in the record in the suit at law, and the judgment is affirmed.

In the suit in equity, the contention on the part of White is, that the contracts and transactions between Barber and himself were wagering contracts and, therefore, void, and that the $6700 was subject to the demand of White, if such contracts were void. It is urged on the part of White, that the wheat was sold by Barber for him without any intention on the part of either of them that there should be any delivery thereof, but with the intention that the transactions should be settled by the payment of the differences between the prices at which the wheat was sold and its prices at the times stipulated for its delivery. White testifies that such was his understanding, communicated to Barber before Barber made the contracts of sale. Barber testifies that he has no recollection of anything of the kind. The evidence as to what White did in connection with the transactions is inconsistent with White's version, and it clearly appears that Barber had no such understanding.

The defence set up in the answer of Barber is proved to every substantial intent, and the facts therein set forth constitute a valid bar to the suit of White. The evidence shows that White in advance required that Barber should trade with parties whom he knew to be responsible; that, in each case, he gave special directions to Barber to buy or to sell, as the case might be, and left it to Barber to put the contract in form, these directions being generally given by telegrams from White at Fort Wayne to Barber at Chicago; that it was understood between them that Barber should buy or sell at the Chicago Board of Trade; that Barber, in all cases, obeyed the orders of White; that White controlled the trades which Barber made; that, unless the margin was exhausted, Barber was not to close out White's trades until White directed him to do so; that it was understood that Barber was to observe

the rules of the board of trade; that White knew that Barber, as a member of such board, making such contracts on the board for White, would be obliged to observe those rules; that White directed Barber when to cover and when to close trades, and that Barber observed his orders; that White acted on his own judgment in making the sales of wheat for delivery in July, 1882; that, when the contracts for those sales had matured, White approved of the tender being made of No. 2 red winter wheat; that, subsequently, on August 5, 1882, White telegraphed to Barber from Fort Wayne, directing him not to cancel the July trades, and saying that White's attorneys at Fort Wayne believed that such tender was good and could be enforced; and that, on the 15th of August, 1882, White, in a letter to Barber, stated that his attorney at Fort Wayne had examined the subject of the July deals, in connection with the rules of the board of trade, and had concluded that the delivery which Barber had tendered was good and was "binding on the buyer, and that we can collect the difference in court." It also appears that Barber was unwilling to default on the contracts lest it should injure his reputation on the board of trade, and that he defaulted on them because White insisted that he should do so. White knew of the rule of the board of trade under which a committee could be appointed to determine what was a fair price for property to be delivered, and was willing to leave it to such committee. After the committee had fixed the price at $1.35 per bushel, White was advised of this action and determined that legal proceedings should be taken to set aside the award of the committee. It was in pursuance of the wish of White that the chancery suit was brought by Barber against the board of trade, to enjoin all action under such award. In that suit, an injunction was obtained to restrain such action, which injunction remained in force until the determination by the Supreme Court of Illinois of a suit brought by one Wright against the Board of Trade, 15 Chicago Legal News, 239, it having been stipulated that the suit of Barber against the board of trade should abide the final result of the Wright suit. The latter suit was decided in favor of the board of

trade. After all this had occurred, White determined to repudiate his obligations to Barber, and, on the 2d of April, 1883, he served on Barber the written notice, claiming that the contracts for the sale of the wheat were illegal and void, and forbidding Barber to pay over any part of the $11,412.50 to any one but White, and demanding the immediate payment of it to him. On the 20th of April, 1883, Barber, having been notified of complaints made against him before the board of trade, under its rules, which provided for the hearing of complaints and for suspension or expulsion in case of non-compliance with contracts, notified White, in writing, of these facts, and asked White if he could protect him (Barber) in any way. Not receiving such protection, Barber, on the 24th of April, 1883, paid out the moneys necessary to satisfy the damages on the contracts, and thereby relieved himself from being suspended from membership in the board of trade. He had no alternative but to pay the money or lose his business, and also lose a sum of money, in the value of his membership in the board of trade, equal to if not greater than the amount in controversy in this suit. He had acted strictly according to the instructions he had received from White. White had left the money in his hands for the express purpose of paying such damages as the committee of the board of trade should find to be due. Barber retained the money in order to allow White to obtain some benefit if he could from the suit in chancery brought by Barber. By that suit and by the suit of Wright all legal means were exhausted, leaving the rights of the purchasers under the contracts of sale to be enforced according to the rules of the board of trade under which they were made. The payment of the money by Barber in satisfaction of those damages was, under the circumstances, demanded by every principle of law and of equity, and no right was left in White to claim the $6700.

White had no right to forbid the payment of the money by Barber, or to recall it from its destination. The money is to be regarded as having been, for all practical purposes, irrevocably set apart by both White and Barber for the payment of such damages, prior to the giving of the notice by

White to Barber on the 2d of April, 1883. White had caused Barber to make the contracts and to become bound for their performance, and had made it necessary that Barber should put up the margins and security, and had thus placed it out of the power of Barber to control the margins and security in any other way than according to the rules of the board of trade, in subordination to which White as well as Barber had acted throughout. It was obedience to the orders of White which had made Barber subject to suspension or expulsion by the board of trade. The $6700 had been put up by Barber as margins, under the rules of the board of trade, prior to the giving of the notice of April 2, 1883, and thus had been before that time devoted by White as well as Barber to the purpose of paying the damages under the rules of the board of trade.

For the reasons thus stated, we are of opinion that the claim of White, sought to be enforced in this suit in equity, cannot be allowed.

A claim is made on the part of White, that he can recover this money under the provisions of § 132 of c. 38 of the Revised Statutes of Illinois. Rev. Stat. by Hurd, ed. of 1883, p. 394; ed. of 1885, p. 405. That section provides that "any person who shall at any time . . . by any wager or bet upon any . . . unknown or contingent event whatever, lose to any person so . . . betting, any sum of money . . . amounting in the whole to the sum of $10, and shall pay . . . the same or any part thereof, the person so losing and paying . . . the same, shall be at liberty to sue for and recover the money . . . so lost and paid . . . or any part thereof, . . . by action of debt, . . . from the winner thereof, with costs, in any court of competent jurisdiction." It is a sufficient answer to this claim to say that Barber was not the "winner" of any money from White.

There is a further view applicable to this case, arising out of the decision of this court in *Higgins* v. *McCrea*, 116 U. S. 671. In that case, Higgins, the broker of McCrea, sued him to recover moneys which Higgins had paid for the purchase, at the Chicago board of trade, of pork and lard, on the

instruction of McCrea, in May, 1883, deliverable in August, 1883, on such day as the seller might elect. In his answer, McCrea set up that he had engaged with the plaintiff in gambling transactions, and that the contracts which the plaintiff had made were not contracts for the actual delivery of any merchandise, but were pretended purchases and mere options, and that it was the understanding of all the parties to the transactions that no merchandise should be delivered on the contracts, but that the same should be settled upon the differences between the contract prices and the market prices. On this basis, McCrea claimed, by way of counterclaim, to recover judgment against the plaintiff for the sum of nearly $20,000, which he alleged he had paid to the plaintiff to carry on such gambling transactions and to purchase option contracts. The plaintiff denied the version thus given by the defendant of the transactions. The Circuit Court had instructed the jury that the defendant was entitled to recover upon his counterclaim, and he had a judgment accordingly. This court held that the case of the defendant, as stated by himself in his answer and counterclaim, was, that the money was advanced by him to carry on a gambling transaction, that with his concurrence the money so advanced was used in such gambling transaction, and that, by the statute of Illinois, where the contracts were made, they were treated as gambling contracts and were void; that the counterclaim thus stated was supported by the testimony of the defendant, given on the trial; that there was no statute of Illinois to authorize the recovery of money paid on such contracts; and that no recovery could be had by the defendant. This court said, in its opinion: "We do not see on what ground a party, who says in his pleading that the money which he seeks to recover was paid out for the accomplishment of a purpose made an offence by the law, and who testifies and insists to the end of his suit that the contract on which he advanced his money was illegal, criminal, and void, can recover it back in a court whose duty it is to give effect to the law which the party admits he intended to violate."

*The decree of the Circuit Court is affirmed.*