THE FIRST NAT. BANK OF LYONS v. THE OSKALOOSA PACK-
ING COMPANY.

1. **Contract**: ILLEGAL CONSIDERATION: GAMBLING ON 'CHANGE. When
the parties to an executory contract for the sale of property intend that
there shall be no delivery thereof, but that the transaction shall be settled
by the payment of the difference between the contract price and the mar-
ket price of the commodity at the time fixed, the contract is void. See
cases cited in opinion.

2. ———: ———: ———: EVIDENCE OF INTENTION AS TO DELIVERY OF
PROPERTY. Defendant was sued upon a note which it alleged was void,
because given to commission merchants to cover margins on gambling
contracts on the Chicago board of trade. *Held* that defendant's presi-
dent, who transacted the business on its part, was properly allowed to
testify that there was no intention on his part that the property named
in the executory contracts of purchase should ever be delivered or paid
for. And, upon consideration of all the circumstances as disclosed by
the evidence, (see opinion,) *held* that the jury was warranted in finding
as a fact affirmatively established that it was the intention of all the
parties to the note that the property should not be delivered, but that
the " deal " should be closed by the payment of the differences; where-
fore the note was void, and judgment was properly rendered for the
defendant.

3. ———: ———: ———: BURDEN OF PROOF AS TO INTENTION TO
DELIVER PROPERTY: QUAERE. The rule which has generally prevailed
in such cases is, that the burden is upon the party claiming that such a
contract is invalid to establish by a preponderance of the evidence that
*neither* party intended that there should be any delivery of the property.
But in view of the well known number and extent of such contracts
constantly entered into in the great trade centers of this country, with
no intention on the part of anyone that the property shall be delivered,
but that the transaction shall be closed by a mere payment of the differ-
ences, *quaere* whether, when the circumstances are such as to throw
doubt upon the intention of the parties, a party claiming rights under
such a contract should not be required to show affirmatively that it was
made with a view to the actual delivery and receipt of the property.
See cases cited in opinion.

*Appeal from Mahaska District Court.*

THURSDAY, APRIL 23.

THIS is an action upon a promissory note. There was a

trial by jury, and a verdict and judgment for the defendant. Plaintiff appeals.

*R. T. Spence, Bolton & McCoy, E. S. Bailey* and *Grant & Brady*, for appellant.

*John F. Lacey, G. W. Lafferty* and *Smith McPherson*, for appellee.

ROTHROCK, J.—The note in suit is for the sum of $15,000, with interest at eight per cent per annum. It was executed by the defendant on the sixth day of July, 1883, payable to the order of Stiles, Goldy & McMahon, and indorsed to the plaintiff. The defendant admitted the execution of the note, but alleged that it was given for margins upon certain purchases of short ribs of pork on the Chicago board of trade, and that it was not intended by the parties that said short ribs should ever be delivered, "but that the purchase thereof was a mere wager or gambling contract, invalid under the laws of both Iowa and Illinois; that said wagering contracts were void, and could not be enforced by the plaintiff; and that there was no legal consideration for said note." The defendant having admitted the execution of the note, the burden was on it to establish the defense upon which it relied. It introduced as a witness one J. N. Green, who testified, in substance, as follows: That he was president of the packing company, and as such president he signed the note in question. That the firm of Stiles, Goldy & McMahon did business on the board of trade in Chicago, and that the packing house bought, through the house of Stiles, Goldy & McMahon, some short rib sides for future delivery, and said commission house wrote to the packing company that they had put up a margin, and wanted something to indemnify them, and that the company sent them the note in suit. That the packing company never received anything for the note, and that the transactions were all by letters and telegrams. That the packing company was a corporation, and its property con-

sisted of the packing house, and tools and implements connected therewith, and that it had no other property or assets. That in November, 1882, he had a conversation with Mr. Stiles, of the firm of Stiles, Goldy & McMahon, in Chicago, in which Stiles inquired as to the amount of capital stock paid up, and amount invested in the property at Oskaloosa, and that he informed Stiles that the capital stock was $50,000, and mostly paid up, and invested in the property, tools and fixtures. That it was not the purpose or intention of the company to take the short rib sides, but to sell the property through the commission house at the maturity of the option, or before. It was expected that it would advance in value, and that there would be a profit in it about that time. "It was my understanding that it would be sold at the end of that time, and the difference would be settled. If there was a profit, it would be credited to the company; if there was a loss, it would be charged to the company. The company had no means to pay for that amount." That he (the witness) never gave any verbal authority to close out these deals.

In addition to the testimony of Green, the defendant introduced the correspondence between the defendant and Stiles, Goldy & McMahon in relation to the transactions between them. It appears that Stiles, Goldy & McMahon acted upon telegrams from the packing house. The first of these telegrams was sent on the fifth day of May, 1883, and is as follows:

"MAY 5, 1883.

" *To Stiles, Goldy & McMahon, Chicago, Ill.:* Buy hundred thousand August ribs to-day, your discretion.

" OSKALOOSA PACKING COMPANY."

There were five other telegrams, dated May 17, 23, 25, 31, and June 6, each ordering the purchase of 100,000 pounds of ribs. Some of these telegrams fixed the price to be paid, and others did not. In response to one of these telegrams, Stiles, Goldy & McMahon made reply as follows:

"*To Oskaloosa Packing Company:* B'ot hundred August ribs, fifty-five.                              "STS. & McM."

Another is as follows: "Bought hundred thousand August ribs, ten forty-five." In answer to the telegram of June 6, the following letter was written:

"CHICAGO, June, 7, 1883.

"*Oskaloosa Packing Company, Oskaloosa, Iowa*—GEN-TLEMEN: Yours of the sixth inst. received. We bought for your account one hundred thousand pounds of August ribs at $9.92½, and wired you the same. Our market did at one time to-day sell down to $9.82½, but closed at $9.95. We have had a slow, dull market all day.    *    *    *    *
"STILES, GOLDY & McMAHON."

There are a number of other letters written by Stiles, Goldy & McMahon to the defendant, in all of which it appears that the value of short ribs very materially declined. On the third day of July, 1883, they wrote the following letter:

"CHICAGO, July 3, 1883.

"*Oskaloosa Packing Company, Oskaloosa, Iowa*—DEAR SIR: Yours of the second inst. received. We telegraphed you this morning the stocks as reported. They have been changed some since by the report of one house that was left out. You will notice by the circulars the details. We have been writing you for some days that we thought that particular day was the worst, and that the bottom had been reached. We are now going to write, this particular day is the worst so far, and are not going to guess the bottom was reached. We incline to look for still lower prices. The bears have been so successful, they will follow up the gain until some outlook brings them to a stand. We shall include statement of your account. You will see the balance now is $18,891.22. We have bought for you 600 M. August ribs, at an average of 10:30. The closing price to-night is 7.85, making balance

against you, that account, say, of $14,700, or in all, to date, $33,591.22. We have not only margined your trades down to the market, but ten per cent more. We have put up as margins about five thousand dollars, not taken into the above account. Now we are out so much money. We have large trades of this kind, and it takes lots of money. We suppose you will send us a note or draft for $20,000 to renew the old paper, as stated in your letter, or, if you cannot send us some money, we should like you to send us your paper for, say, fifteen thousand dollars, say 30 days, so that we may use it the same as the other. Respectfully,

"STILES, GOLDY & McMAHON."

We suppose that it was in response to this letter that the note in suit was executed. The last letter of the series was dated July 9, and is as follows:

"CHICAGO, July 9, 1883.

"*Oskaloosa Packing Company*, *Oskaloosa*, *Iowa*—GEN-TLEMEN: Yours of the seventh instant received. You will see by the circulars that we have had another very bad day. Aug. ribs sold down to 7.30, which shows a loss on your 600 M. of over eighteen thousand dollars. You must send us some money or we shall be obliged to close out your deals. Send five thousand dollars by return mail, and we think you will be able to carry through, and, in the end, regain part of your loss. Your dispatch of this date received. We shall look for you, Mr. Green, to-morrow.

"Respectfully, STILES, GOLDY & McMAHON."

In all this correspondence the name of the person or persons from whom the six separate purchases of 100,000 pounds of ribs were made is not disclosed. The purport of all the correspondence is that the price of the property was going down, and the loss of the defendant increasing, and a demand for more margins. These demands do not appear to have been made by any persons designated as the sellers of the property, but by Stiles, Goldy & McMahon.

We have set out the evidence with some particularity, because the case turns upon the question whether there was sufficient evidence to warrant the jury in finding that the note was void, as being founded upon an illegal and gambling transaction; and it is proper to say at the outset that, as there is no claim made that the plaintiff is invested with any right which did not exist in favor of the payees of the note, the rights of the parties are to be determined by the same rules as though the note had not been indorsed, and as though the action had been brought in the name of the payees. It is well settled that, when the parties to an executory contract for the sale of property intend that there shall be no delivery thereof, but that the transaction shall be settled by the payment of the difference between the contract price and the market price of the commodity at the time fixed, the contract is void. *Gregory v. Wattowa*, 58 Iowa, 711; *Murry v. Ocheltree*, 59 Id., 435; *Pixley v. Boynton*, 79 Ill., 351; *Logan v. Musick*, 81 Id., 415; *Corbett v. Underwood*, 83 Id., 324; *Bigelow v. Benedict*, 70 N. Y., 202.

*[margin note: 1. CONTRACT: illegal consideration: gambling on 'change.]*

These, and many other cases that might be cited, hold that, in order to establish the invalidity of one of this class of contracts, it must be shown by a preponderance of the evidence that both parties to the contract intended that it should be performed by a mere payment of differences, and not by a delivery of the property. This rule is not disputed by counsel for appellant, and the court fully and fairly instructed the jury that they must, in the determination of the case, be governed by that rule. Some complaint is made by appellant that the instructions were not as explicit as they should have been, and that certain instructions asked by the plaintiff should have been given; but we think the complaint is not well founded. It appears to us that the very question which the jury were required to determine was submitted to them so plainly and fairly that there can be no just cause of complaint in that respect.

The witness Green was the president of the defendant corporation, and the several contracts were made by him as such officer. It is very clearly shown by his testimony that he at no time intended that the 600,000 pounds of ribs should be delivered to him and be paid for by him. His evidence is strongly corroborated by the fact that it was no part of the business of defendant to deal in options on the Chicago board of trade. The transaction, if a valid one, involved the payment of some $60,000 in performance of the contracts, and the packing company had no assets except such as were invested in its real estate, and the tools, implements and fixtures necessary to carry on its business. Objection was made to the testimony of the witness Green, as to his intention with reference to the transaction. We think the objection was properly overruled. It was plainly the right of the defendant to show that there was no intention on its part that the property should be delivered to it. This essential element in the case the defendant was bound to establish, and there was no better evidence by which to show it than by proving the intention of the very party who made the contracts in behalf of the defendant. The jury were fully warranted in finding from the evidence that the defendant did not at any time intend that any short ribs should be delivered in pursuance of the contracts, but that the transaction was one of those myriad affairs known as mere marginal contracts, by which millions of bushels of grain, and millions of pounds of the produce of the country, are ostensibly made to change hands by sale and purchase, without the existence of the commodity, except in imagination, and upon the books of commission merchants, and in contracts such as are shown by the several telegrams in this case.

But it is claimed that there was no evidence in the case by which the jury was warranted in finding that the other party to the transaction intended that the contracts should be performed by a mere settlement of differences. And here it is

*2. ——: ——: ——: evidence of intention as to delivery of property.*

important to inquire,—who was the other party? There is no evidence in the case by which the jury could determine that these six several purchases of ribs were bought from any specific person or persons. In all the letters and telegrams of Stiles, Goldy & McMahon, there is no intimation of the name of any seller. They never at any time, directly or by inference, gave the defendant to understand that there were *bona fide* parties with whom they had contracted, and that such parties were able and willing to perform by the delivery of the commodity purchased, and that the sellers were importunate for more margins. They constantly demanded margins for themselves. Of course it was an impossibility for the defendant to prove that some mythical, undisclosed and unknown sellers, with whom Stiles, Goldy & McMahon claimed they contracted, had a like intention with the defendant that no delivery should be made, but that there should be a mere settlement of differences.

But we do not deem it necessary to inquire further as to these unknown contractors. This is an action upon a promissory note given to Stiles, Goldy & McMahon, which they claimed was to reimburse them for margins advanced for the defendant. If they knew that this was an illegal and gambling transaction, and understood that it was to be settled without any delivery of the ribs, no recovery can be had upon the note. They stand in no better position than mere stakeholders in a gambling transaction, who loan money to one of the gamblers to enable him to make his bet upon the turn of a card, the speed of a horse, or the success of a candidate for an office. *Irwin v. Williar*, 110 U. S., 499; *Thompson v Cummings*, 68 Ga., 124; *Barnard v. Backhaus*, 52 Wis., 593.

We are to determine whether the facts and circumstances were such as to warrant the finding that Stiles, Goldy & McMahon should be charged with participation in an illegal and gambling transaction. The defendant did not put these parties upon the stand as witnesses and prove by them what

their intentions were. But the intention of a party may be shown without using him as a witness. The acts and declarations of a person show his purposes and intentions, and these are the usual proofs of intention. And their acts and declarations are clearly competent to show that those hidden and undisclosed sellers, if there were, in fact, any such persons in existence, did not intend to deliver the property. And one of the very strongest circumstances in support of the defense is that no sellers were disclosed. We need not here repeat the evidence. It is enough to say that the whole correspondence between the parties refutes the idea that there was some seller or sellers who would at some time in August deliver to the defendant 600,000 pounds of ribs, and that defendant should receive the property and pay some $60,000 in money. It was a " deal," it is true, but the jury was fully warranted in finding that as to all the parties, known and unknown, it was a " deal" to be closed out by a mere settlement of differences.

Another very important fact in the case is that Stiles, Goldy & McMahon knew that the packing company did not intend to receive and pay for the property. They knew this because they were fully advised that the whole property of the corporation was insufficient to pay the $60,000. In their correspondence they repeatedly advised the defendant that it had lost so much money, naming the amount. In one letter they say, " Your loss is becoming a serious matter." In another it is said, " You must keep us fully informed how far you want to carry this deal, and do not carry it further than you are prepared to pay the loss." In another letter they say, "As the market closed to-night, your loss on the ribs will amount to about eleven thousand dollars." As we have said, there was no intimation at any time that there would be a tender of the property to the defendant and a demand of payment.

The case of *Flagg v. Baldwin*, 38 N. J. Eq., 219, (30 Alb. Law J., 364,) was an action by a stock-broker to fore-

close a mortgage given to him to cover certain losses in speculations in stocks upon margins. The defense contested the right of recovery upon the ground that the contracts out of which the claim arose were wagering contracts, illegal and void. It is said, in the opinion in that case: "These enormous transactions were far beyond the ability of appellants at any time, and were known to be so. It appears that respondent was notified that the advance was all that Flagg had to speculate with. The wife's note, and subsequently her bond and mortgage, were resorted to, with the avowed purpose of binding her separate property. Respondent admits that he was informed and knew that Flagg was speculating for all that Mrs. Flagg and he had in the world. Under such circumstances, it is idle to pretend that there was or could be any hope or expectation that appellants were to take, or could be required to take, these vast amounts of stock. For respondent to have tendered them and demanded payment for them would have been absurd in the extreme. The whole circumstances show that no such right to tender entered into the transaction. On the contrary, the contract plainly was that if the stocks bought advanced, the profit was to be realized by a sale; if they declined, the remedy of the respondent to save himself was by a sale. The settlement was to be the profits and losses thus ascertained."

We quote this language, because it appears to us to be peculiarly applicable to the case at bar. It cannot with any plausibility be claimed that any of the parties to this transaction intended or expected that the defendant would take the 600,000 pounds of ribs.

We have thus far considered this case by adhering to the rule that it is incumbent on the defendant to show that all the parties to the transaction intended that there should be no delivery of the property. That rule is the law of this case, because the court so instructed the jury. Counsel for appellee cite us to cases which do not seem to require an application of the

3. ——: ——: : burden of proof as to intention to deliver property: quaere.

rule to its full extent. In *Cobb v. Prell*, 5 McCrary, 80, a case, in many of its features, very much like the case at bar, it is said: "It is the duty of the courts to scrutinize very closely these time contracts, and if the circumstances are such as to throw doubt upon the question of the intention of the parties, it is not too much to require a party claiming rights under such a contract to show affirmatively that it was made with an actual view to the delivery and receipt of the grain;" citing *Barnard v. Backhaus*, 52 Wis., 593. It cannot be denied that there is much force in this language, in view of the fact, known to all men, and of which courts and juries cannot be oblivious, that of the thousands of transactions of this kind which are entered into each month in the great trade centers of this country, the parties thereto do not deliver the commodity purchased, but merely settle differences in values.

But, without now entering upon any advanced ground in reference to this species of speculation in values, we conclude that the jury were fully warranted in finding from the evidence, as an affirmatively proven fact, that none of the parties intended that there should be a delivery of the property, but that the " deal " should be closed by a mere settlement of differences.

AFFIRMED.