Osgood v. Bauder & Co.

## OSGOOD v. BAUDER & Co. *et al.*

1. **Sale:** SEVERABLE CONTRACT: GAMBLING: STATUTE OF ILLINOIS: PLACE OF PERFORMANCE. Defendants contracted with plaintiff's assignor for one hundred and fifty cars of coal, to be delivered free on board cars at Chicago within a certain time, and at a certain rate per ton to be paid in thirty days; with the privilege of ordering, upon the same terms, two hundred and fifty cars more of said coal. *Held—*

   (1) That the contract was one to be performed in the state of Illinois where the coal was to be delivered, and that it was to be judged as to its validity by the laws of that state.

   (2) That the contract was severable,—the first part being a contract of actual sale, and the second part a contract for the right to purchase or not at defendant's option.

   (3) That the optional part of the contract was void under the statute of Illinois, which provides : "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or any other commodity * * * shall be fined * * *; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

2. ———: DELIVERY IN INSTALLMENTS: NON-PAYMENT: RESCISSION. Where coal was to be delivered in installments, each shipment to be paid for thirty days after delivery, the seller could not rescind the contract and refuse to deliver the rest of the coal, on the ground that the purchaser had failed to pay for the prior shipments as per agreement. (See cases cited).

Osgood v. Bauder & Co.

3. ———: FUTURE DELIVERY: FAILURE TO DELIVER: DAMAGES. Where there is a contract of sale for future delivery, and the purchase price is not paid in advance, the measure of damages for failure to deliver is the difference between the contract price and the market price at the time of delivery as fixed by the contract. (See cases cited).

*Appeal from Linn District Court.*—HON. J. H. PRESTON, Judge.

FILED, OCTOBER 20, 1888.

ACTION to recover $5,605.94, alleged to be the unpaid part of the purchase price of coal, sold by the assignor of plaintiff to defendants. The cause was tried to a jury, and a verdict and judgment rendered for defendants. The plaintiff appeals.

*McNett & Tisdale* and *Frank C. Hormel*, for appellant.

*Hayes & Schuyler* and *Thompson & Lanning*, for appellees.

ROBINSON, J.—On the twenty-eighth day of July, 1886, the plaintiff's assignor, the Whitebreast Coal Company, by a traveling salesman named Russell, entered into an agreement with the defendants for the sale and delivery to them, on the cars in Chicago, of a quantity of coal. It is the claim of plaintiff that this agreement required the coal company to ship during the months of August and September, to points to be designated, one hundred and fifty cars of coal, but subject, so far as the time of shipment was concerned, to the custom and rules governing the hard-coal trade; and also subject to the condition that the coal company should not be liable for delays and failure in shipment, when such delays and failure were the result of causes beyond its control, such as its inability to procure transportation from the mines in Pennsylvania, or from Chicago. Plaintiff further claims that the coal company notified defendants about August 11, 1886, that it would

become difficult, in a short time, to secure prompt shipments of coal, and requested liberal orders for coal for shipment in that month; that notwithstanding such request defendants ordered but sixteen cars during August; that, from the latter part of that month it was so difficult to obtain transportation that from that time to the end of the following December only eighty-six more cars of coal could be shipped to defendants; and that the total number of cars so shipped was one hundred and two. The defendants claim that their agreement with the coal company was verbal, but that Russell delivered a written memorandum thereof, as follows:

"30 cars No. 4,   $4 65 f. o. b. Chgo.
 70 " Nut,   $4 65   "   "
 45 " Stove,   $4 65   "   "
  5 " Egg,   $4 40   "   "

(Scranton)

" Shipped as ordered, Aug. & Sept.

" Privilege of 250 cars more. No larger proportion of No. 4 during Aug. & Sept. Terms, 30 days.

"WHITEBREAST COAL CO.

"S. G. RUSSELL, Sales Agent."

Defendants further claim that the agreement required the delivery to them of one hundred and fifty cars of Scranton coal, of the kinds and for the prices per ton named; and that it gave to them the privilege of ordering, during August and September, 1886, two hundred and fifty additional cars of the coal on the same terms; that they exercised this privilege, and ordered four hundred car-loads before the end of September; that the coal company failed to furnish two hundred and ninety of the car-loads so ordered; that by the custom of trade, and as understood by the parties, a car-load was to contain at least fifteen tons; that after the agreement was made the price of coal advanced to $6.25 per ton; and that defendants sustained damage, by reason of the failure of the coal company to fill their orders, to the amount of $6,860. They demand that this amount be treated as a counter-claim to any demand held by plaintiff, and admit that he is the assignee of the coal company. The plaintiff denies that a privilege was given to defendants to order two

hundred and fifty additional car-loads, and alleges that Russell had no authority to give such a privilege ; that, if given, it was within the statute of frauds, and void ; that it was without consideration ; that it was too indefinite and uncertain to have binding force ; that it never became valid because of a mistake of the parties to it ; that if given it was a contract entered into and to be executed within the state of Illinois, and is governed by the laws of that state ; that it was in violation of such laws, and therefore void.　Demurrers to portions of the reply were sustained.

I.　The first question presented for our consideration is the validity of the alleged agreement, so far as it gave to defendants the privilege of ordering two hundred and fifty car-loads of coal in addition to the one hundred and fifty first provided for.　The answer alleges the agreement in the following terms : " That on or about the twenty-eighth day of July, A. D. 1886, the said defendants made and entered into a verbal contract with the said Whitebreast Coal Company for the purchase of one hundred and fifty car-loads of Scranton coal, to-wit :　Thirty car-loads No. 4, at $4.65 per ton ; seventy car-loads nut, at $4.65 per ton ; forty-five car-loads stove, at $4.65 per ton ; five car-loads egg, at $4.40 per ton,—to be shipped as ordered in August and September, at thirty days' time ; with the privilege, upon the part of said defendants, of so ordering, upon the same terms, two hundred and fifty cars more of said coal, with no greater proportion of No. 4 than above mentioned."　The plaintiff alleged in his reply that, at the time of making this agreement, there existed in Illinois a statute as follows :　" Whoever contracts to have or to give to himself or another the option to sell or buy, at a future time, any grain or any other commodity, stock of any railroad or any other company, shall be fined not less than ten dollars, nor more than one thousand dollars, or confined in the county jail not exceeding one year, or both ; and all contracts made in violation of this section shall be considered gambling

1. SALE: severable contract: gambling: statute of Illinois: place of performance.

contracts, and. shall be void." Plaintiff also alleges
that the contract was made in Illinois, and was and is
an Illinois contract, governed by the laws of that state;
and that it is in violation of the provision quoted. A
demurrer to this portion of the reply was sustained.
It is claimed by appellee that the statute in question
was meant to cover gambling contracts, where no actual
delivery is contemplated; that the contract in this case
was not an option to buy at a future time, but was a
present purchase, with an option to increase the quan-
tity of coal to be actually taken; that the pleadings
show that the coal was not to be delivered within the
state of Illinois, but outside thereof; that the statute
does not change the common law as to validity of con-
tracts, but puts a criminal penalty to contracts that are
and were void at common law; that to make the con-
tract in this case void, and subject to the statutory
penalty, it must appear that it was mutually intended
that no delivery should be made, but that a settlement
should be had on a gambling basis, according to change
in the market price of coal.

The claim that the contract was not to be performed
within the state of Illinois is not sustained by the plead-
ings. They show that the duty of the coal company
ended with the delivery of the coal free of charge on
board the cars in Chicago; nor is the claim that the
Illinois statute does not make contracts to which it
applies void, well founded. The admitted language of
the statute is that all contracts made in violation of it
"shall be considered gambling contracts, and shall be
void." The question for us to determine is whether the
agreement in question falls within the provisions of the
statute. It is claimed by appellant that the transaction
between the coal company and defendants was virtually
two contracts—one of which was legal, and the other
illegal; while appellees claim that there was but one
agreement, and that, since that contemplated an actual
sale and delivery of at least one hundred and fifty car-
loads of coal, it must be held valid in all its provisions.
If there was in fact but a single contract, a part of which

was valid, the effect claimed by appellees would not result. If the contract is not separable, and is illegal in part, then it is invalid as an entirety, and cannot be enforced. *Dillon v. Allen*, 46 Iowa, 300; *Casady v. Woodbury County*, 13 Iowa, 116; 2 Pars. Cont. 673; Metc. Cont. 221, 246.

But we think the contract is separable. It is said that "if the part to be performed by one party consists of several distinct and separate items, and the price to be paid by the other is apportioned to each item to be performed, or is left to be implied by law, such a contract will generally be held to be severable; and the same rule holds where the price to be paid is clearly and distinctly apportioned to different parts of what is to be performed, although the latter is in its nature single and entire." 2 Pars. Cont. 517. It is said in Metc. Cont. 246, "that, if one of two considerations of a promise be void merely, the other will support the promise; but that, if one of two considerations be unlawful, the promise is void. When, however, the illegality of a contract is in the act to be done, and not in the consideration, the law is different. If, for a legal consideration, a party undertakes to do two or more acts, and part of them are unlawful, the contract is good for so much as is lawful, and void for the residue. Whenever the unlawful part of a contract can be separated from the rest, it will be rejected, and the remainder established." In this case the purchase price was to be paid on each shipment, thirty days after it was made, and the price was affixed to each ton of coal. Hence there was no difficulty in separating the parts of the contract, and no injustice would result in so doing.

But the agreement must of necessity be considered as separable for the reason that it consisted of two parts—one of which was in effect a contract of purchase, and the other a contract for the privilege of purchasing. We shall therefore treat so much of the contract as relates to the two hundred and fifty car-loads of coal as separate and distinct from the remainder. Thus considered, there can be no

question that it is a contract to give to defendants the right to buy coal at a future time. But it is said that this right is not an "option," within the meaning of the statute, and that the statute "was passed to curb the gambling transactions of boards of trade in large cities, and to reach such contracts there made, and made in similar ways, and was never intended to reach contracts like the one in suit, when, upon an actual sale, a privilege, based upon the same transaction and consideration, was given to take more of the sold article upon the same terms." We have no guide to the legislative intent in this case, excepting the language of the statute. That gives no color to the claim that its application is not to be as broad as its terms. It is true, the word "option" is not defined in the statute; but the pleadings do not show that it was used with reference to any local definition or usage. The supreme court of Illinois has defined the word as used in the statute in a number of cases. It has said that "the true idea of an option is what are called in the peculiar language of the dealers 'puts' and 'calls.' A 'put' is defined to be the privilege of delivering or not delivering the thing sold, and a 'call' is defined to be the privilege of calling for or not calling for the thing bought. 'Optional contracts,' in this sense, are usually settled by adjusting market values, as the party having the option may elect. It is simply a mode adopted of speculating in difference in market values of grain or other commodities. It must have been in this sense that the term 'option' is used in the statute. Such a contract is obviously fictitious, having none of the elements of good faith, as in a contract where both parties are bound, and is defined by statute as a gambling contract. Fictitious purchases or sales, such as were in the contemplation of the parties, were as nothing; and it is a matter of no consequence where it is pretended they were made, whether on the board of trade or elsewhere." *Pearce v. Foote,* 113 Ill. 228; citing *Pixley v. Boynton,* 79 Ill. 351. In *Tenney v. Foote,* 4 Bradw. 594, approved, on appeal, 95 Ill. 99, the court said: "The word 'option,' as used in the statute here, taken with the

context, means a mere choice, right or privilege of selling or buying; and it is the contracting for such choice, right or privilege of selling or buying, at a future time, any commodity, that the statute was intended to prohibit, as contradistinguished from an actual sale or purchase with the intention of delivering and accepting the commodity specified." The case of *White v. Barber*, 123 U. S. 392, 8 Sup. Ct. Rep. 221, is cited by both parties to this appeal. In so far as it construes the statute under consideration, it is in harmony with the decisions quoted. By implication, it approved an instruction of the trial court which stated that "the statute is leveled against what are called 'puts' and 'calls;' that is, the right or the privilege which a party may have to buy or sell of you at a future day—not an absolute agreement now to sell, but where one man pays another five or ten dollars for the privilege of delivering to him one thousand or five thousand or ten thousand bushels of grain at a future time, or pays him a similar amount for the privilege of buying or accepting from him grain at a future time; a contract which cannot be enforced in terms, because it is wholly at the option of the party holding the option whether he will call for the grain or not. That is what is termed a 'gambling contract,' or a 'put' or 'call,' or an option to buy or sell at a future time, within the meaning of the Illinois statute."

Many cases have been cited by counsel, which involve the principle that, "when the parties to an executory contract for the sale of property intend that there shall be no delivery thereof, but that the transaction shall be settled by the payment of the difference between the contract price and the market price of the commodity at the time fixed, the contract is void." *First National Bank of Lyons v. Oskaloosa Packing Co.*, 66 Iowa, 46. But such cases are not directly in point. In the case at bar the intent of the parties at the time the agreement was entered into does not appear. So far as the pleadings show, the defendants may at all times have intended to demand the sale to them of the two hundred and fifty cars of coal. Under the contract and the statute

Osgood v. Bauder & Co.

pleaded, the intent with which defendants entered into the contract does not seem to us to be material. It was nothing which the coal company could enforce. There was nothing in the contract to prevent defendants from changing their intent at pleasure. In the absence of legal or moral obligation, people usually do those things which they think will result in benefit, and avoid doing those which would result in loss. Therefore it must have been understood by both parties to the contract, when it was made, that defendants would not claim the privilege which it attempted to give, unless it should prove to be for their financial interest to do so. If the price of coal advanced after the contract was made, the defendants would insist on the privilege, and if the price declined the privilege would be abandoned. Conceding that the consideration of the optional part of the contract is found in the obligation of defendants to purchase one hundred and fifty car-loads of coal, yet it is clear that the option was designed for the benefit of defendants, and to secure to them the privilege of speculating on the changes in the market. In our opinion, such a transaction is as much a gambling contract, within the meaning of the Illinois statute, as though the parties to it had intended that no coal should be delivered, but that the coal company should pay to defendants the difference in their favor between the contract price and the market price at the date named for delivery. We therefore conclude that the demurrer which we have been considering should have been overruled.

II. The plaintiff alleged in his petition that the coal company was released from all obligation to ship more cars of coal than it did, for the reason

2. ——: delivery in installments: nonpayment: rescission.

that defendants failed to pay for the coal shipped within the time and in the manner provided by the contract. He now complains of rulings of the court which excluded evidence offered to sustain that issue. We discover no error in these rulings. The agreement provided for the payment for each shipment thirty days after it was made. The alleged breach did not go to the whole consideration of

the contract, and the coal company did not, therefore, have the power to rescind the contract. *Hansen v. Consumers' Steam Heating Co.*, 73 Iowa, 775; *Myer v. Wheeler*, 65 Iowa, 395.

III. The court below permitted the defendants to show the market price of coal in Chicago from the date of the contract to December, 1886. Appellant complains of that ruling, and insists that the measure of damages was the difference between the contract price and the market price at the time of delivery fixed by the contract. We understand this to be the rule where, as in this case, the purchase price is not paid in advance. *Cannon v. Folsom*, 2 Iowa, 110; *Jemmison v. Gray*, 29 Iowa, 540; 1 Sedg. Dam. 260; 2 Suth. Dam. 377; 2 Greenl. Ev. sec. 261. In our opinion the ruling of the court was erroneous.

<div style="margin-left:2em; font-size:smaller;">

3. ——: future delivery : failure to deliver: damages.

</div>

IV. In view of the conclusion we have reached as to the validity of the optional part of the contract in suit, it becomes unnecessary to consider further various questions discussed by counsel. For the errors pointed out the judgment of the district court is

<div align="right">REVERSED.</div>