## C. G. SPRAGUE, PLAINTIFF IN ERROR, v. NATHAN H. WARREN ET AL., DEFENDANTS IN ERROR.

[FILED APRIL 10, 1889.]

1. **Negotiable Instruments:** CONSIDERATION. In an action on a promissory note, the defense being that it was given for losses sustained by the sale of options on corn in Chicago, the testimony showed that the persons purchasing the corn were young men employed as clerks in the town of A., Nebraska, and that they had little or no property; that they purchased 5,000 bushels of wheat in Chicago, through commission men, and gave the commission men in Chicago a draft for $250, as margins; that the wheat deal resulted in a profit to the purchasers. A second wheat deal also resulted in a small profit. An order was thereupon given to purchase 5,000 bushels of corn, and the aforesaid $250 was continued as a margin. A decline in the price of corn absorbed the margin, and a further decline left the purchasers indebted to the commission men, for which the note in suit was given. *Held,* That where there was no intention of the parties to purchase and receive the grain, and no intention of the sellers to deliver the same, no recovery could be had on the contract.

2. ———: WAGERING CONTRACT. In considering such contracts, although the outward forms of law may have been complied with, yet where the defense is that the contract is a wagering one, and not intended for the actual sale and delivery of property, it is the duty of the courts to go behind the contract and examine the facts and circumstances which attended the making of it in order to ascertain its true character.

3. ———: ———: EVIDENCE. Where doubt is cast upon the validity of the contract by the testimony, it is the duty of the party claiming any rights under it to make it satisfactorily and affirmatively appear that the contract was made with the intention to deliver the grain.

4. ———: ———: ———. Where a commission merchant testifies that he never had a warehouse receipt for grain in a warehouse, which he claimed to have purchased on the order of certain parties residing at A., in this state; that he did not know in what elevator the alleged grain was which he claimed to have purchased, and that he settled the alleged losses by "ringing up" in the board of trade, *held,* that his testimony failed to show a *bona fide* purchase of grain for actual delivery.

ERROR to the district court for Kearney county. Tried below before GASLIN, J.

*J. L. Mc Pheely, William Leese,* and *J. M. Stewart,* for plaintiff in error, cited : *Cobb v. Prell,* Am. Law Register, N. S., vol. 22, p. 609 ; *Rudolf v. Winters,* 7 Neb. 125 ; *Lowry v. Dillman,* 59 Wis. 197 ; *Wall v. Schneider,* Id. 352 ; *Murry v. Ocheltree,* 59 Iowa, 435 ; *Barnard v. Backhaus,* 52 Wis. 593 ; *Tomblin v. Callen,* 28 N.W. Rep. 573 ; *First National Bank v. Oskaloosa Packing Co.,* 23 Id. 255.

*Calkins & Pratt,* for defendant in error, cited : 1 Greenleaf Ev., sec. 45, p. 200 ; *Michel v. Ware,* 3 Neb. 229 ; Comp. Stat. 1887, sec. 13, chap. 92.

MAXWELL, J.

This action was brought in the district court of Kearney county by the defendants in error against the plaintiff in error upon the following instrument :

"$351.02                    MINDEN, April 18, 1883.

"On the 18th day of April, 1885, for value received, I promise to pay to the order of N. H. Warren & Co., Three Hundred and Fifty-one and $\frac{02}{100}$ dollars, at Chicago, with interest equal to ten per cent per annum from date until paid, together with a sum equal to ten per cent of amount due as liquidated damages, if action is brought on this note or on the mortgage given to secure the same, or if the same is not paid when due.                    C. G. SPRAGUE.

"No. ............ of this date.

"P. O. Address .......................

"Date due, April 18, 1885."

The defendant in his answer "Admits the execution of the said note sued upon, described, and set forth, in petition of plaintiffs herein, but denies that he is indebted to plaintiffs on said note and said cause of action set forth in the

petition, in the sum of $351$\frac{02}{100}$, and interest, or in any other sum.

" Defendant, for further answer and defense, herein complains of the plaintiffs and says that heretofore, on the 1st day of February, 1882, plaintiffs were commission merchants in Chicago, Illinois; that plaintiffs at said time, in the firm name of N. H. Warren & Co., dealt and traded in what are known as options, on 'change, in Chicago, in grain, by selling and buying in market on 'change certain grain for future delivery, when in fact no delivery was ever intended or demanded, and no grain was bought or sold, or intended to be; that on said date defendant took an option of said plaintiffs on grain as aforesaid for future delivery, when in fact no delivery was ever intended or demanded, and no grain was bought or sold, or intended to be; that the whole transaction was a venture and speculation on margins, depending for profit or loss on the fluctuations of the market, and purely a fictitious and gambling transaction; that in such and said transaction no consideration was received; that the said note sued upon herein was given for loss in so trading in said options, at said time as aforesaid, and is without consideration and wholly void, which plaintiffs well knew, in violation of the law and contrary to public policy."

On the trial of the cause the jury returned a verdict in favor of the defendants in error, and a motion for a new trial having been overruled, judgment was entered on the verdict.

The testimony shows that in December, 1882, the plaintiff in error and one Daniel W. Fisher were young men employed as clerks, and without capital, and resided at Aurora, in Nebraska. In December of that year they sent a telegram signed C. G. Sprague & Co. to the defendants in error at Chicago to purchase 5,000 bushels of wheat for them, which, it is claimed, was done. The defendants in error were engaged in business as grain and commission mer-

chants at Chicago, Illinois. Sprague & Co. were required by the defendants in error to put up a margin of two hundred and fifty dollars. This they did. This wheat deal was closed out about January 23, 1883, the profit being two hundred and seventy-five dollars. Sprague & Co. therefore directed the defendants in error to make a second purchase of 5,000 bushels of wheat, the former margin of two hundred and fifty dollars to remain to their credit as a margin. This wheat deal was closed out a few days afterwards, the net profits of Sprague & Co. being twelve dollars and fifty cents. In neither of these cases had the wheat been delivered to Sprague & Co. On the 27th of January, 1883, Sprague & Co. directed the defendants in error to purchase for them 5,000 bushels of February corn; the two hundred and fifty dollars heretofore spoken of to remain as a margin. Fisher testifies that Sprague & Co. directed the defendants in error, as soon as the corn deal was closed out, to purchase for them 5,000 bushels of May wheat; that the defendants in error did not wait for the closing of the deal, but purchased 5,000 bushels of May wheat; and that as the price declined, and heavy demands were made upon Sprague & Co. for margins, Sprague assumed the corn deal, and Fisher the deal in wheat; and the note in question was given by Sprague for alleged losses in the sale of the corn. The deposition of Nathan H. Warren, one of the defendants in error, was taken in the case, and on cross-examination he testifies as follows:

A. We do sometimes deal in options in the future; the firm.

Q. Now will you please answer my first question? Do you know from your experience on the board whether the bulk of the transactions there, in grain, consists of speculations in the future?

A. My impression is there is a good deal; I have no means of knowing.

Q. Are all the contracts in question, which you have testified to, what are known as deals in future options?

A. None of them are.

Q. Will you explain what is meant by that phrase, "dealing in future options"?

A. Dealing in future options is where you have option to take the grain or not. The contract is where you contract to take it.

Q. Was any of the wheat or grain purchased by you under the orders you have testified to, delivered, to your knowledge?

A. The grain was delivered.

Q. Which grain?

A. There was but one 5,000 bought.

Q. From whom was that grain purchased?

A. J. B. Peabody & Company.

Q. When?

A. On the 27th of January.

Q. Where?

A. On the board of trade in Chicago.

Q. What was done with the grain when it was purchased?

A. It was paid for on the first of February. It was February delivery.

Q. Question repeated. Now please answer.

A. It was purchased on the 27th of January for delivery in February. In February it was paid for.

Q. Question repeated. Now please answer. What was done with the grain when it was purchased?

A. That is an idiotic question; what was done with the grain when it was purchased in January for February delivery.

Q. Nevertheless, I ask you to state again what was done with the grain when it was purchased.

A. It was taken in and paid for in the office.

Q. Taken into what office?

A. Into my office.

Q. The grain was?

A. The grain is represented by receipts for grain.

Q. What did you do with it then?

A. We carried it.

Q. Now, please state what became of the grain.

A. It was sold on the 18th day of April.

Q. Was it delivered to you?

A. It was.

Q. When?

A. On the 1st day of February.

Q. What did you do with it then?

A. We carried it.

Q. Where did you put it?

A. We probably put it in the bank.

Q. The grain?

A. The receipts.

Q. I am now asking you about the grain itself. Do you know what became of the grain which you purchased?

A. It was kept in the elevators of the city.

Q. In what elevator?

A. I do not know. In a regular elevator. It was stored in a regular elevator. I do not know which particular elevator it was stored in. It makes no difference.

Q. If the 5,000 bushels of grain now in question were ever delivered to you, state when and where.

A. At my office. The first day of February.

Q. Did you ever see, or handle, or store, the grain yourself? and if so, where?

A. I am not a storer of grain.

Q. Did any one in your employ, to your knowledge, or any agent of yours, receive or store this grain, or any one for you?

A. No.

Q. Did you ever pay any storage charges?

A. We did.

Q. To whom?

A. We paid it to G. H. Sidwell & Company.

Q. Who is he?

A. He is a commission merchant on the board of trade.

Q. Has he a storage house for storing corn?

A. Not that I know of.

Q. Did you ever pay any elevator charges on this corn?

A. No, not to elevator proprietors.

Q. Did you ever pay them to any one, if not to an elevator proprietor?

A. We did.   We paid them to Mr. Sidwell.

Q. For what elevator proprietor?

A. We don't know.

Q. When was this payment of allowance made to Sidwell?

A. When the grain was sold; on the 18th of April.

Q. When you sold the grain, state how and when and where you delivered it.

A. We delivered it to Mr. Sidwell, on the 18th of April, 1883, at his office.

Q. How?

A. By the receipts.

Q. By what receipts?

A. By the receipts representing 5,000 bushels of regular grain stored in Chicago regular elevators.

Q. What elevator, if any; do you know?

A. I do not know what they were in; they were simply regular.   It is all that is required.

Q. Did the storage receipt contain the name of no elevators?

A. Yes.

Q. What?

A. I don't know.

Q. Then you don't know, as a matter of fact, where the grain was stored from the time you bought it until you sold it?

A. I don't know now. I knew at the time. It was immaterial where it was stored. It was in a regular elevator.

He also further testifies:

Q. You were asked in your cross-examination if you or any of your firm saw the corn or wheat that were purchased under these transactions. You may state what is the course of dealings in regard to certificate or warehouse receipts in buying and selling grain in Chicago; whether by certificates, and what the certificates represent.

A. The grain comes in by rail, and is received and placed in elevators. The proprietors issue certificates or warehouse receipts. These warehouse receipts are what represent the grain bought and sold and delivered.

Q. You may state whether these warehouse receipts are transferable by indorsement?

A. They are.

Q. In purchasing grain in the warehouse, what, then, is the actual transaction?

A. After the purchase is made the warehouse receipts are delivered.

Q. To whom?

A. To the purchaser, upon payment of price agreed upon.

Q. Did you receive any warehouse receipt for the first 5,000 bushels purchased for the defendants?

A. No; I would not have taken them if they had been presented to me. No, I did not.

Q. Why would you not have taken them had they been presented?

A. Because I would have had to carry them until May, when we had bought them carried for us until May.

Q. Then when you purchased the grain under the orders in question, you did not receive the receipt, as you have testified is customary. Is that so?

A. No; it was ordered sold before the time for receiving them.

Q. I understand you to say, when the grain is purchased, the warehouse receipts are delivered. Is that so?

A. The contract for May delivery, when May comes, we receive them, the warehouse receipts; the grain, represented by receipts.

Q. Then it is not customary on purchasing grain to receive the warehouse receipts; but only on delivery. Is that so?

A. The warehouse receipts do not pass until the time for delivery has arrived. The contract expired.

Q. That is, when making the contract for a future delivery, you would be entitled to the grain or warehouse receipts at the time of delivery and not before?

A. Yes, sir.

There is a large amount of testimony to the same effect. Sprague & Company were residents of a town in the interior of this state, from which corn was constantly shipped to Chicago, it being one of the staple products of the state. Sprague & Company therefore did not desire corn for the purpose of shipping it west into the state, and this fact must have been well known to the defendants in error. Sprague & Fisher both testify that they did not desire the grain, and it will be seen by an examination of the testimony of Mr. Warren that he purchased no grain for them. He says he had no warehouse receipt and did not want any; that the warehouse receipt would be delivered when the grain was paid for. If the grain had been purchased *bona fide* as being in one of the elevators in Chicago, a warehouse receipt, or some written evidence issued by the warehouse company, would have been delivered to the purchaser.

Nothing of this kind, however, was received by the defendants in error. This, to our mind, shows the want of good faith in the purchase. In addition to this, we find that the credit of two hundred and fifty dollars, deposited by C. G. Sprague & Company with the defendants in error,

for margins on wheat, in January, 1883, was carried forward as a margin on the corn deal in question. There is no pretense on the part of the defendants in error that they had purchased and paid for the corn. All that the testimony shows is a mere right to purchase, which was not settled by the payment of money, but by "ringing up." The rule is well established that when the parties to an executory contract for the sale of property do not intend that the property shall be delivered, but that the transaction is to be settled by the payment of the difference between the contract price and the market price of the article at a time stated, the contract is void. (*First National Bank v. Oskaloosa Packing Co.*, 23 N.W. Rep. 255; *Gregory v. Wattowa*, 58 Iowa, 711; same case, 12 N.W. Rep. 726; *Murry v. Ocheltree*, 59 Iowa, 435; same case, 13 N.W. Rep. 411; *Pixley v. Boynton*, 79 Ill. 353; *Logan v. Musick*, 81 Id. 415; *Corbett v. Underwood*, 83 Id. 324; *Bigelow v. Benedict*, 70 N.Y. 202.) Real contracts for the delivery of property at a future time will be sustained, because parties then deal with actual property. Where, however, there was no intention to deliver the property, but simply to pay the difference between the contract price and the price on the day agreed upon, the contract will not be enforced, as in fact it is a mere wager. It is the duty of courts and juries, therefore, to scrutinize these time contracts very closely, and see whether they were really intended by the parties as contracts for the purchase and delivery of the property.

Neither will it do to attach too much importance to the form of the instrument, for it is always possible for the parties to conceal the true nature of the transaction by complying with the outward forms of the law. It is the duty of the courts, therefore, where the validity of the contract is challenged, to receive evidence outside of the words of the contract, and examine the facts and circumstances which attended the making of it, in order to ascertain, if possible,

whether it was intended as a *bona fide* transaction for the purchase and delivery of the property, or merely colorable. In *Barnard v. Backhaus*, 9 N.W. Rep. 596, the supreme court of Wisconsin says: "And to justify a court in upholding such agreement, it is not too much to require a party claiming rights under it, to make it satisfactorily and affirmatively appear that the contract was made with an actual view to the delivery and receipt of grain, not as an evasion of the statute against gaming, nor as a cover for a gambling transaction." Sprague and Fisher were young men in the employ of others, and without capital. They ordered the purchase of a large quantity of grain in Chicago. The defendants in error made no inquiry, so far as it appears, as to their business standing and financial ability. All that they required in the first instance was a margin of two hundred and fifty dollars; and, so far as appears, had the difference between the purchase price and the market price been kept good — that is, had money to pay these losses been furnished — the transaction might have run for years. The case has all the ear-marks of a gambling transaction, and it devolves upon the defendants in error to show that the purchase of the grain was *bona fide*, and for actual delivery. This they failed to do, and the verdict is against the clear weight of evidence. The judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED AND REMANDED.

COBB, J., concurs.

REESE, CH. J., dissents.